LAWSON, DEPUTY COMMISSIONER, UNITED STATES EMPLOYEES' COMPENSATION COMMISSION, *v.* SUWANNEE FRUIT & STEAMSHIP CO. ET AL.

No. 56.   Argued December 7, 1948.—Decided February 14, 1949.

*Newell A. Clapp* argued the cause for petitioner. *Solicitor General Perlman, Assistant Attorney General Morison, Philip Elman, Paul A. Sweeney* and *Morton Liftin* filed a brief for petitioner.

*Harry T. Gray* argued the cause for respondents. With him on the brief was *Sam R. Marks*.

MR. JUSTICE MURPHY delivered the opinion of the Court.

This is a workmen's compensation case, under the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U. S. C. § 901 *et seq.* A narrow and difficult question of statutory construction confronts us.

John Davis lost the sight of his right eye in an accident unconnected with industry or his employment. He was later hired by respondent. An injury occurred during this employment, and he is now blind in both eyes. The parties agree that he is totally disabled within the meaning of the Act; they also agree that the employer is liable for compensation for the loss of the left eye. The dispute is narrowed to this question: should the employer or the statutory second injury fund, administered by petitioner, be liable for the balance of payments to equal compensation for total disability?

Petitioner concluded that the employer was liable. The employer secured a reversal of this determination in the District Court for the Southern District of Florida, 68 F. Supp. 616,[1] and the Court of Appeals for the Fifth Circuit affirmed the judgment of the District Court. 166 F. 2d 13. Because this decision conflicted with that of the Court of Appeals for the District of Columbia in *National Homeopathic Hospital Association* v. *Britton,* 79 U. S. App. D. C. 309, 147 F. 2d 561, cert. denied 325 U. S. 857, we granted certiorari.

---

[1] Under § 21 of the statute.

Section 8 (f) (1) of the Act provides that "if an employee receive an injury which of itself would only cause permanent partial disability but which, *combined with a previous disability*,[2] does in fact cause permanent total disability, the employer shall provide compensation only for the disability caused by the subsequent injury: *Provided, however,* That in addition to compensation for such permanent partial disability, and after the cessation of the payments for the prescribed period of weeks, the employee shall be paid the remainder of the compensation that would be due for permanent total disability. Such additional compensation shall be paid out of the special fund established in section 44." The court below held that this section is "clear and unambiguous, and therefore needs no construction. When read in its ordinary sense it can have but one meaning": liability for the second injury fund.

But the word "disability" is defined in the statute. Section 2 provides that "when used in this Act . . . , (10) 'Disability' means incapacity because of *injury* . . . ." (Emphasis supplied.) The word "injury" is, in turn, defined as "accidental injury or death arising out of and in the course of employment . . . ." § 2 (2). If these definitions are read into the second injury provision, then, it reads as follows: "If an employee receive an injury which of itself would only cause permanent partial disability but which, combined with a previous *incapacity because of accidental injury or death arising out of and in the course of employment,* does in fact cause permanent total disability, the employer shall provide compensation only for the disability caused by the subsequent injury." Because Davis' previous injury was nonindustrial, this reading points to liability for the employer.

---

[2] Emphasis supplied.

If Congress intended to use the term "disability" as a term of art, a shorthand way of referring to the statutory definition, the employer must pay total compensation. If Congress intended a broader and more usual concept of the word, the judgment below must be affirmed. Statutory definitions control the meaning of statutory words, of course, in the usual case. But this is an unusual case. If we read the definition into § 8 (f) (1) in a mechanical fashion, we create obvious incongruities in the language, and we destroy one of the major purposes of the second injury provision: the prevention of employer discrimination against handicapped workers. We have concluded that Congress would not have intended such a result.

Chief Justice Groner, dissenting in the *National Homeopathic* case, 79 U. S. App. D. C. at 313, 147 F. 2d at 565, noticed that the "inter-replacements of words" we have set out above "produces a manifest incongruity, for . . . it would literally result in this: '. . . previous *incapacity* because of accidental injury or *death*'—And if to avoid this it be argued that only a portion of the definition of injury should be inserted, the result would be to change or at least to limit the statutory definition only to produce a desired result, which no one would urge or defend. It is evident, therefore," that the definition of disability was "not made with watch-like precision" and should not be so applied in § 8 (f) (1). If the intent of Congress had been to limit the applicability of this subsection in the fashion for which petitioner contends, "it could easily have accomplished this by the insertion of the word 'compensable' between the words 'previous' and 'disability'. . . ." And see *Atlantic Cleaners and Dyers* v. *United States,* 286 U. S. 427.

More important, perhaps, is the disservice we would do to the purpose of the second injury provision. We must look to the explanation of congressional intent behind

the subsection. A witness at a hearing on the measure outlined his reasons for favoring the provision in the following manner: "The second injury proposition is as much to the advantage of the employer and his interests as it is for the benefit of the employee. It protects that employer who has hired, say, a one-eyed worker who goes and loses his other eye and becomes a total disability. The employer without this sort of thing would have to pay total permanent disability compensation. Then, on the other hand, this also protects the worker with one eye from being denied employment on account of his being an extra risk. Now, by simply taking this up in this way it is possible to protect both the employer and to protect the one-eyed employee also." [3]

Petitioner relies on the statement of another witness before the Senate Committee, who favored inclusion of the second injury provisions because "they have become a commonplace . . . in State compensation legislation and ought to be included in the act." [4] And petitioner states that "we may appropriately refer, therefore, to the second injury provisions in other statutes and to the evaluations made by administrative experts in the field for guidance with respect to the manner in which opposing policy considerations have been resolved." But our search for guidance in the sources suggested by petitioner convinces us that petitioner's theories are not well-founded.

From the attitude of experts in the field, one would not expect Congress to distinguish between two types of handicapped workers. The annual conventions of the International Association of Industrial Accident Boards

---

[3] Hearings before Committee on the Judiciary, House of Representatives on S. 3170, 69th Cong., 1st Sess. (1926), p. 208.

[4] Hearings before Subcommittee of the Senate Committee on the Judiciary on S. 3170, 69th Cong., 1st Sess. (1926) p. 43.

and Commissions provide the most helpful considerations of the problem. At the 1931 convention, Mr. Joseph Parks of the Massachusetts Commission spoke as follows of workmen's compensation legislation without a second injury provision: "I little knew that this great piece of legislation . . . would become an instrument of persecution, as I may call it, of men who are physically handicapped, but that is what it has become. Men who are physically handicapped are being discriminated against in our Commonwealth." [5]

This attitude has been echoed by Mr. Charles Sharkey of the United States Bureau of Labor Statistics; [6] Miss Frances Perkins, then Industrial Commissioner in New York; [7] and others. [8] Perhaps the most impressive evidence of the force behind these statements is that offered by Mr. I. K. Huber of Oklahoma. *Nease* v. *Hughes Stone Co.*, 114 Okla. 170, 244 P. 778, held the employer liable for total compensation for loss of the second eye. After the decision, Mr. Huber reports, "thousands of one-eyed,

---

[5] United States Bureau of Labor Statistics, Bull. No. 564 (1932), p. 278.

[6] United States Bureau of Labor Statistics, Bull. No. 577 (1933), p. 146.

[7] United States Bureau of Labor Statistics, Bull. No. 536 (1931), p. 254.

[8] "We are dealing with a condition and not a theory. If the man is found with some defect which, if he meets with an accident, is likely to be aggravated and made more severe and thus increase the cost to the employer whose experience rating goes up as a result, then he does not want to accept that risk; and that poor fellow is met with the alternative of being deprived of a means of earning a livelihood or of waiving his rights to compensation." *Ibid.*, p. 256. And see Discussion of Industrial Accidents and Diseases, United States Division of Labor Standards, Bull. No. 94 (1948), p. 104; United States Bureau of Labor Statistics, Bull. No. 602 (1934), p. 11, *ff.*, especially p. 15; United States Bureau of Labor Statistics, Bull. No. 577 (1933), pp. 154, 155.

one-legged, one-armed, one-handed men in the State of Oklahoma were let out and can not get employment coming under the workmen's compensation law of Oklahoma. . . . Those . . . court decisions put us in bad shape. . . . The decision displaced between seven and eight thousand men in less than 30 days in Oklahoma." [9]

A distinction between a worker previously injured in industry and one handicapped by a cause outside of industry has no logical foundation if we accept the premise that the purpose of the fund is that of aid to the handicapped. This is the conclusion of Mr. Fred Wilcox, then Chairman of the Wisconsin Commission: [10] "Wisconsin takes no account of where the injured man may have gotten his first injury. It makes no difference where he got it. It is just as serious to him, when he has the second injury, as if he had gotten the first one in industry." We cannot attribute the illogic of petitioner's position to Congress.

---

[9] United States Bureau of Labor Statistics, Bull. No. 536 (1931), pp. 268, 272. Mr. Fred Wilcox, former Chairman of the Wisconsin Commission, said: "Fundamentally, there is no moral reason why the employer of a man, when he gets his second injury, should not pay the full cumulative effect of that injury . . . but that is not the way things work out. The employer escapes the burden and lets the injured man bear it, and he sits at home without a job. . . . The employer is going to be afraid to take them on because of some added responsibility. . . . We allowed the employee who lost his second eye to have twice as much compensation for the loss of the second eye as for the loss of the first eye. But what about it? Did anyone ever get any compensation for the loss of a second eye? No; he never got a job. He never got a chance to lose his second eye in an industry—to be blunt in stating the facts. Employers would not hire him, because they would take on twice as much liability as they had before." United States Bureau of Labor Statistics, Bull. No. 577 (1933), pp. 157, 158.

[10] *Id.*

Our conclusion is reinforced by the administrative practice under the New York statute. The federal statute is based upon New York law.[11] In New York "the commission holds that if the man loses his second eye in an industrial accident it is immaterial how he lost the first eye. The loss of eyesight in one eye may have been congenital; it may have occurred when the child was two years old, or it may have occurred after he was grown, but not in an industrial accident. Nevertheless, at the time he loses his second eye, he has suffered total disability." [12]

Petitioner argues that New York law is to the contrary, citing *La Belle* v. *Britton Stone & Supply Corp.*, 247 App. Div. 843, 286 N. Y. S. 347, and *Bervilacqua* v. *Clark*, 225 App. Div. 190, 232 N. Y. S. 502. The *La Belle* case is inadequately reported; the *Bervilacqua* case did not consider the precise point involved in this case, and was distinguished by the New York Attorney-General in 1937 when he advised the Department of Labor to continue its established practice. Annual Report of the Attorney-General, State of New York, for 1937 (Albany, 1938), p. 270.

Petitioner's most strenuous argument is that the fund will soon be insolvent if we open liability to a nonindustrial previous injury, and that therefore Congress could not have contemplated the result we reach.[13] Petitioner's

[11] H. R. Rep. No. 1190, 69th Cong., 1st Sess., p. 2. See *Employers' Liability Assurance Corp., Ltd.* v. *Monahan,* 91 F. 2d 130; *Hartford Accident & Indemnity Co.* v. *Hoage,* 66 App. D. C. 154, 85 F. 2d 411.

[12] United States Bureau of Labor Statistics, Bull. No. 577 (1933), p. 154.

[13] Payments are made from the special fund established in § 44 of the Act. Employers pay $1,000 into the fund for noncompensable deaths, half of which is available for second injuries. All penalties and fines collected are also paid into the fund. § 44 (c).

worries seem exaggerated in the light of Wisconsin and New York experience. From 1919 to 1933,[14] Wisconsin's fund had only 50 second injury cases charged against it. Second-Injury Funds as Employment Aids to the Handi-capped, U. S. Division of Labor Standards (1944), p. 7. From 1919 to 1943, only 99 cases were charged against the New York fund. *Id.*, p. 5. In 1930 Miss Frances Perkins told her associates that the problem is "not so large . . . as it appears." [15]

On the basis of the incongruity involved in applying the definition mechanically, the unmistakable purpose of the second injury fund, and the interpretation of the State statute on which the federal act is based, we conclude that the term "disability" was not used as a term of art in § 8 (f) (1), and that the judgment must be affirmed.

*Affirmed.*

MR. JUSTICE DOUGLAS dissents.

---

[14] In 1933 the Wisconsin Supreme Court decided *Ruehlow* v. *Industrial Commission,* 213 Wis. 240, 251 N. W. 451, which reversed the administrative practice outlined by Mr. Wilcox, *supra.* Compare *Lehman* v. *Schmahl,* 179 Minn. 388, 229 N. W. 553.

[15] United States Bureau of Labor Statistics, Bull. No. 536 (1931), p. 260. At p. 259, Mr. L. W. Hatch of New York is reported as follows: "Many people have said, 'Oh, well, if you make a second-injury fund take care of every case in which a prior condition was a material factor in the man's disability you will bankrupt the State or the taxpayers will be called upon to bear an enormous burden.' The evidence so far as we have gone does not indicate any such situation."