**In the Matter of Arthur L. WILLCHER, Respondent.**

**No. M-102-81.**

District of Columbia Court of Appeals.

Submitted May 14, 1982.

Decided July 2, 1982.

Fred Grabowsky, Bar Counsel, Washington, D. C., for Bd. on Professional Responsibility (of the District of Columbia Court of Appeals).

William W. Taylor, III, Washington, D. C., for respondent.

Before NEWMAN, Chief Judge, and KELLY and PRYOR,* Associate Judges.

KELLY, Associate Judge:

This matter is before the court for consideration of the "Report and Recommendation of Board on Professional Responsibility" with respect to disciplinary proceedings instituted at our direction against respondent, Arthur L. Willcher, a member of the bar, who was convicted in Superior Court of unlawful solicitation of money from an indigent defendant whom he had been appointed to represent under the District of Columbia Criminal Justice Act ("CJA"),[1] in violation of D.C.Code 1978 Supp., § 11-2606(b) (now D.C.Code 1981, § 11-2606(b)). The Board on Professional Responsibility ("Board") concluded that respondent's conduct did not constitute an offense involving moral turpitude requiring permanent disbarment under D.C.Code 1973, § 11-2503(a)[2] (now D.C.Code 1981, § 11-2503(a)), but that it did violate DR 1-102(A)(4)[3] and DR 1-102(A)(5),[4] and recommended a three-year suspension.

We disagree with the Board and hold that the offense of which respondent was convicted was one involving moral turpitude within the meaning of D.C.Code 1973, § 11-2503(a), mandating permanent disbarment. *See In re Kerr*, D.C.App., 424 A.2d

---

* *Associate Judge* PRYOR did not participate in the disposition of this appeal.

1. D.C.Code 1978 Supp., §§ 11-2601 *et seq.* (now D.C.Code 1981, §§ 11-2601 *et seq.*).

2. D.C.Code 1973, § 11-2503(a), provides in pertinent part:

     When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, ... the court shall, pending final determination of an appeal from the conviction, suspend the member of the bar from practice.... If a final judgment of conviction is certified to the

court, the name of the member of the bar so convicted shall be struck ... and he shall thereafter cease to be a member....

3. DR 1-102(A)(4) of the American Bar Association's Code of Professional Responsibility, as amended by the court (*see* D.C.App.R. X) provides: "A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

4. DR 1-102(A)(5) provides: "A lawyer shall not engage in conduct that is prejudicial to the administration of justice."

94 (1980). Accordingly, we do not adopt the sanction recommended by the Board.

## I

Respondent was convicted by a jury in Superior Court of unlawful solicitation of money from an indigent whom he had been appointed to represent under the CJA.[5] He was sentenced to six months' imprisonment and fined $700. Execution of the prison sentence was suspended, and respondent was placed on probation for fifteen months. His conviction was affirmed on appeal. *Willcher v. United States,* D.C.App., 408 A.2d 67 (1979).

On October 24, 1979, this court referred the matter to the Board to institute formal disciplinary proceedings against respondent and to review the elements of the crime of which respondent was convicted to determine whether the crime involved moral turpitude within the meaning of D.C.Code 1973, § 11–2503(a). On December 13, 1979, the Board, having determined that a violation of § 11–2606(b) was not *per se* a crime of moral turpitude, referred the matter to a hearing committee to determine if respondent's actual conduct which was the basis for his conviction involved moral turpitude within the meaning of D.C.Code 1973, § 11–2503(a), if respondent had violated any disciplinary rules, and if so, the sanction to be imposed. Bar counsel instituted formal proceedings, charging respondent with violations of DR 1–102(A)(3),[6] DR 1–102(A)(4) and DR 1–102(A)(5).

A hearing was held before Hearing Committee No. 7 on May 21, 1980. Based on the record before it, the committee found that respondent's actual conduct did not amount to moral turpitude within the meaning of D.C.Code 1973, § 11–2503(a) and therefore did not rise to the level of conduct requiring permanent disbarment. It also found that respondent had violated DR 1–102(A)(3), DR 1–102(A)(4) and DR 1–102(A)(5). The hearing committee recommended that respondent, who was already under a five-year suspension for twelve counts of misconduct, *see In re Willcher,* D.C.App., 404 A.2d 185 (1979), be suspended for an additional year. Both bar counsel and respondent opposed the sanction recommended by the committee.

A hearing was held before the Board on May 14, 1981. Bar counsel contended that respondent should be disbarred pursuant to § 11–2503(a) because the crime of which he was convicted involved moral turpitude, and because of his prior disciplinary record. Respondent urged the Board not to impose any additional discipline in light of the fact that he was presently under a five-year suspension, and because the present proceeding involved conduct which occurred during the same period as the twelve counts of misconduct upon which respondent's five-year suspension was based.

The Board adopted the hearing committee's findings of fact but rejected, as a matter of law, its conclusion that respondent's conduct constituted a violation of DR 1–102(A)(3). The Board stated that since the committee found that respondent's offense was not a crime involving moral turpitude under § 11–2503(a), it followed in accordance with the court's holding in *In re Colson,* D.C.App., 412 A.2d 1160 (1979), that it was not moral turpitude under DR 1–102(A)(3). The Board therefore dismissed that charge but agreed that respondent's conduct violated DR 1–102(A)(4) and DR 1–102(A)(5). It concluded, however, that the committee's recommended sanction of a one-year suspension added to respondent's current suspension was inadequate since the

5. D.C.Code 1978 Supp., § 11–2606(b) provides:
   Any person compensated, or entitled to be compensated, for any services rendered under this chapter who shall seek, ask, demand, receive, or offer to receive, any money, goods, or services in return therefor from or on behalf of a defendant or respondent shall be fined not more than $1000 or imprisoned not more than one year or both.

For a detailed discussion of the facts of the case, *see Willcher v. United States,* D.C.App., 408 A.2d 67 (1979).

6. DR 1–102(A)(3) provides:
   A lawyer shall not engage in *illegal conduct involving moral turpitude* that adversely reflects on his fitness to practice law. [Emphasis added.]

conduct contained an element of dishonesty. The Board determined that respondent's behavior warranted a three-year suspension, but it nonetheless agreed with respondent that the unlawful solicitation of money from his client occurred within the same period of time as the conduct giving rise to the five-year suspension.[7] The Board therefore recommended that respondent be suspended for three years, effective from October 11, 1979. Two members of the Board concurred in the recommended sanction but disagreed with the Board's conclusion that respondent's conduct did not violate DR 1–102(A)(3).[8]

## II

The Board adopted the hearing committee's conclusion that "Respondent's conduct, while plainly inimical to the standards of the profession, did not . . . sink to the level of enormity requiring eternal disbarment," and therefore did not amount to moral turpitude within the meaning of D.C.Code 1973, § 11–2503(a). We disagree.

■ The term "moral turpitude" has been defined generally as importing "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." *Attorney Grievance Commission of Maryland v. Walman*, 280 Md. 453, 459, 374 A.2d 354, 358 (1977) (quoting *Braverman v. Bar Association of Baltimore*, 209 Md. 328, 344, 121 A.2d 473, 481, *cert. denied*, 352 U.S. 830, 77 S.Ct. 44, 1 L.Ed.2d 51 (1956)). When applied in the context of attorney misconduct, the term connotes a fraudulent, *Iowa State Bar Association v. Kraschel*, 260 Iowa 187, 197, 148 N.W.2d 621, 627 (1967), or dishonest, *Committee of Legal Ethics v. Scherr*, 149 W.Va. 721, 726, 143 S.E.2d 141, 147 (1965), intent. As Justice Traynor said for the California Supreme Court in *In re*

*Hallinan*, 43 Cal.2d 243, 247, 272 P.2d 768, 771 (1954), *appeal after remand*, 48 Cal.2d 52, 307 P.2d 1 (1957):

Although the problem of defining moral turpitude is not without difficulty, it is settled that whatever else it may mean, it includes fraud and that a crime in which an intent to defraud is an essential element is a crime involving moral turpitude. It is also settled that the related group of offenses involving intentional dishonesty for personal gain are crimes involving moral turpitude. . . . [Citations omitted.]

■ Respondent's conduct in violation of D.C.Code 1978 Supp., § 11–2606(b) is clearly an offense involving both fraud and intentional dishonesty for personal gain. He was appointed, pursuant to the CJA, to represent an indigent defendant, Ferdinard Diaz, on felony charges. While admitting that Diaz was entitled to a "free lawyer," respondent demanded first $500 and then $1,000 from Diaz and his parents in return for his services, a practice prohibited by § 11–2606(b). Demands for money from CJA clients are particularly egregious offenses since they violate the very essence of the CJA—a statute whose purpose is to insure that persons accused of crimes and lacking financial resources have professional services available for their defense. Moreover, respondent's conduct amounted to a double fraud—one on Diaz, who was entitled by the CJA to a "free lawyer," and his family; and one on the judicial system itself. Since the unlawful solicitation of money from an indigent client by an attorney appointed under the CJA, in violation of § 11–2606(b), is always a fraud on the client who is entitled to legal services free of charge and on the judicial system, we hold that a violation of § 11–2606(b) falls squarely within the definition of an offense

---

**7.** Respondent's five-year suspension commenced on July 27, 1976.

**8.** These members felt (as did the hearing committee) that there are "greater and lesser degrees of moral turpitude" and that despite our

holdings in *Colson* and *Kerr*, an attorney's conduct may at the same time involve "moral turpitude" under the rules of this court but not "moral turpitude" under the statute.

inherently involving moral turpitude.[9] This court established in *In re Colson, supra,* that some offenses inherently involve moral turpitude. *In re Roberson,* D.C.App., 429 A.2d 530, 531 (1981). When an attorney is convicted of such an offense, this court and the Board are "compelled, by virtue of [D.C. Code 1973, § 11–2503(a)] to order his name stricken...." *In re Colson, supra* at 1168.

For the foregoing reasons, respondent is disbarred from the practice of law in the District of Columbia and is prohibited from holding himself out to be an attorney at law licensed to practice here. The clerk shall enter an appropriate order effecting the imposition of discipline.

*So ordered.*

NEWMAN, Chief Judge, concurring:

I join fully in Judge Kelly's opinion for the court and write to add the following. The Supplementary Opinion of Lawrence J. Latto, joined by Allen Snyder,* makes clear that the Board and its Hearing Committees "have struggled" with the meaning of "moral turpitude" in § 11–2503(a) since our decisions in *Colson* and *Kerr.* This "struggle" results from a reluctance to impose the mandated sanction of "super disbarment."

While I fully understand the desire to enhance flexibility over mandatory sanctions, I respectfully submit that it is not the province of the Board, the Hearing Committees or members thereof, or, indeed, of this court, to construe the statute based on disagreement with, or disapproval of, the mandated sanction.

9. We note that in *In re Foshee,* Bar Docket No. 240–74B (April 12, 1976), the Board found that an attorney who had committed the same offense as respondent had violated DR 1–102(A)(3)—that is, committed an act involving moral turpitude, and recommended suspension. That recommendation was approved by this court in an unpublished memorandum opinion, *In re Foshee,* No. S–48–77 (D.C.App., Mar. 17, 1977). *In re Foshee* was decided before *In re Colson, supra,* where we instructed the Board to make an initial determination as to whether the attorney's crime inherently involves moral turpitude under D.C.Code 1973, § 11–2503(a). Thus, neither the Board nor this court addressed the question decided today—whether a violation of § 11–2606(b) is an offense inher-

BOARD ON PROFESSIONAL RESPON-SIBILITY DISTRICT OF COLUMBIA COURT OF APPEALS

Bar Docket No. 158–78
IN THE MATTER OF ARTHUR L. WILLCHER.

REPORT AND RECOMMENDATION OF BOARD ON PROFESSIONAL RESPONSIBILITY

Respondent was convicted by a jury in the Superior Court of the District of Columbia for the unlawful solicitation of money from an indigent defendant whom Respondent had been appointed to represent under the D.C. Criminal Justice Act.[1] (*U.S. v. Willcher, Criminal Case No. 8310–77.*) He was sentenced to six (6) months' imprisonment and fined $700. Execution of the prison sentence was suspended and Respondent was placed on probation for 15 months during which time he was ordered not to accept any appointment on CJA cases. On appeal to the District of Columbia Court of Appeals Respondent's conviction was affirmed.

On October 24, 1979, the District of Columbia Court of Appeals referred the matter to the Board on Professional Responsibility to institute formal disciplinary proceedings. The Board also was directed by the Court to review the elements of the crime for which Respondent was convicted to determine whether or not the crime involved moral turpitude within the meaning of D.C.Code § 11–2503(a).

ently involving moral turpitude. *Foshee* is unique and no longer of precedential value.

* A copy of the Report and Recommendation of the Board on Professional Responsibility and the Supplementary Opinion are attached hereto.

1. D.C.Code Section 11–2606(b) provides:
"Any person compensated or entitled to be compensated for any services rendered under this chapter who shall seek, ask, demand, receive, or offer to receive any money, goods, or services in return therefor from or on behalf of a defendant or respondent shall be fined not more than $1,000 or imprisoned not more than one year, or both."

On December 13, 1979, the Board referred the matter to a hearing committee for an evidentiary hearing to determine (1) if Respondent's actual conduct which was the basis for his conviction involved moral turpitude within the meaning of D.C.Code § 11–2503(a); (2) the sanction to be imposed against Respondent under Rule XI, § 15(4); and (3) if Respondent had violated any disciplinary rules, and if so, the sanction to be imposed.

Bar Counsel instituted formal proceedings in which Respondent was charged with violation of DR 1–102(A)(3) (engaging in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law); DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; and DR 1–102(A)(5) (engaging in conduct that is prejudicial to the administration of justice).

On May 21, 1980, a hearing was held before Hearing Committee Number Seven. The evidence adduced at the hearing consisted of exhibits tendered by both Bar Counsel and Respondent, and a brief statement by Respondent to the Hearing Committee. Bar Counsel's exhibits included the entire record relating to Respondent's conviction in the criminal case above referred to, and the affirmance of said conviction by the D.C. Court of Appeals (Bar Exhibits Nos. 1–8). Respondent's exhibits included letters from several doctors attesting to Respondent's mental state during the period the events surrounding his conviction took place. (Respondent's Exhibits D, E, and F.)

Based upon the record before it, the Hearing Committee found that Respondent's actual conduct which led to his conviction did not amount to moral turpitude within the meaning of D.C.Code § 11–2503(a), and therefore, did not rise to the level of conduct requiring eternal disbarment. The Hearing Committee's finding was based upon the following observations:

(1) Congress defined Respondent's crime as a misdemeanor not a felony.

(2) Respondent did not in fact complete the fraud that he had set in motion by his solicitation of a fee, not having attempted to cash the Diaz check, or submitted a voucher for payment pursuant to the Criminal Justice Act requirement.

(3) That the trial judge did not mete out to Respondent the maximum penalty allowed by law, which is one year's imprisonment, but instead sentenced Respondent to a six-month suspended sentence and barred him from accepting CJA cases for fifteen months.

The Hearing Committee also found that Respondent had violated DR 1–102(A)(3) (engaged in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law); DR 1–102(A)(4) (engaged in conduct involving dishonesty, and DR 1–102(A)(5) (engaged in conduct that was prejudicial to the administration of justice).

The Hearing Committee found no basis in the evidence in the record for concluding respondent's criminal conduct was in whole or in part the product of depression, as argued by Respondent during his presentation of his case.

In recommending an appropriate sanction to be imposed against Respondent, the Hearing Committee took into consideration (1) that Respondent is now 65 years of age; (2) that Respondent already is under a five-year suspension which will terminate on or about July 26, 1982;[2] and (3) that the Board and the Court of Appeals have previously meted out rather light discipline (three months' suspension) for the same offense, citing *In re Foshee* (D.C.App. Memorandum Opinion No. S–48–77).

The Hearing Committee, therefore, recommended that Respondent be suspended for an additional year, commencing on or about July 27, 1982. The Hearing Committee also recommended that in any proceeding for reinstatement, discrete consideration be given to Respondent's violation of D.C.Code, Section 11–2606(b) since, in the

2. *In re Willcher* (D.C.App.1979), 404 A.2d 185.

Hearing Committee's view, Respondent's conduct which led to his conviction and the present proceeding, is far more serious than the misconduct for which he presently is under suspension, which is neglect.

Both Bar Counsel and Respondent opposed the sanction recommended by the Hearing Committee.

The matter came before the Board for a hearing on May 14, 1981. Bar Counsel took the position that Respondent should be disbarred pursuant to D.C.Code § 11–2503(a) because of his conviction and his prior disciplinary record.[3] Respondent urged the Board not to impose any additional discipline in light of the present five-year suspension, and the fact that the present proceeding and Respondent's conviction are based on conduct which occurred within the same period as the conduct upon which Respondent's five-year suspension is based. Respondent also argued that the Board's recommendation for the five-year suspension, which was adopted by the D.C. Court of Appeals, took into consideration, Respondent's mental condition,[4] and the Board's leniency in cases involving similar conduct, e.g., *In re Foshee, supra.*

The Board adopts the findings of fact of the Hearing Committee, but rejects, as a matter of law, its conclusion that respondent's conduct constitutes a violation of DR 1–102(A)(3). The Committee found that respondent's offense was not a crime involving moral turpitude within the meaning of Title 11, § 2503(a) of the District of Columbia Code. We concur. Once a determination has been made that the offense does not involve moral turpitude under that statute it follows in accordance with the Court's holding in *In the Matter of Colson*, 412 A.2d 1160, 1163–4, that it is not moral turpitude under DR 1–102(A)(3). Accordingly, if the Board accepts the Committee's finding that respondent's conduct did not constitute moral turpitude under Section 2503(a), as it does, we must conclude that it was not moral turpitude under DR 1–102(A)(3) and dismiss that charge.

The Board agrees with the Hearing Committee that Respondent's conduct in the present proceeding involves violations of DR 1–102(A)(4) and (5). The Board is of the opinion, however, that the recommended sanction of suspension for one year added to Respondent's current suspension is inadequate as a measure of the seriousness of the misconduct involved and inconsistent with the sanctions imposed in similar situations. See, e.g., *In re Haupt*, 422 A.2d 768 (D.C.App.1980), and *In re Smith*, 403 A.2d 296 (D.C.App.1979).[5] Because it is conduct which contains the element of dishonesty, and not mere neglect of a legal matter entrusted to him, Respondent's behavior warrants a three-year suspension. The Board nonetheless, agrees with Respondent that the conduct giving rise to Respondent's conviction and this proceeding occurred within the same period of time as the conduct giving rise to the five-year suspension of Respondent on the eleven separate charges of neglect. The Board believes

---

3. Respondent's prior disciplinary record indicates that Respondent was formerly admonished in 1973, and presently is under a five-year suspension for conduct involving eleven cases of neglect.

4. In its recommendation for a five-year suspension instead of disbarment, the Board found "that there is a strong likelihood that respondent was suffering from a severe form of depression at the time of misconduct, and that his misconduct was a result of, or at least exacerbated by, his debilitated mental condition." This finding was adopted by the D.C. Court of Appeals.

5. In *Haupt* the Court found that respondent neglected his client and made false statements to the client and Bar Counsel. Holding that this constituted a continued pattern of similar misconduct, the Court imposed a three-year suspension. In *Smith* respondent was found to have neglected two clients and to have made false or fraudulent statements to one client. Smith was suspended for eighteen months. Although the misconduct in the instant matter involves a single client, it must be considered in connection with the pattern of other misconduct on the part of the respondent which occurred during the time frame of the instant case. It should also be noted that the instant matter involves criminal conduct. Despite the severe sanctions imposed, in neither *Smith* nor *Haupt* was evidence of criminal behavior present.

that it is only by some fortuitous circumstances that the present charge was not included and considered with the other eleven charges, and that because of the mitigating factors which were taken into consideration when the five-year suspension was imposed,[6] no substantial period of suspension beyond the present suspension is warranted.

Accordingly, the Board recommends that Respondent be suspended from the practice of law for a period of three (3) years, effective from October 11, 1979, the date Respondent's conviction was affirmed by the D.C. Court of Appeals.

FOR THE BOARD ON
PROFESSIONAL RESPONSIBILITY

By: /s/ Florence R. King

Date: Oct. 23, 1981

Miss Rosenberg was not a member of the Board during consideration of this matter and thus takes no position in its disposition. Mr. Latto has filed a Supplementary Opinion in which he is joined by Mr. Snyder. All other members of the Board join in Ms. King's Report.

BOARD ON PROFESSIONAL RESPON-
SIBILITY DISTRICT OF COLUMBIA
COURT OF APPEALS

Bar Docket No. 158–78
IN THE MATTER OF ARTHUR
L. WILLCHER.

SUPPLEMENTARY OPINION

I concur in the Recommendation of the Board as found in the concluding paragraph of the Report and Recommendation written by Ms. King. I do not, however, agree with the Board's conclusions with regard to D.R. 1–102(A)(3) and D.C.Code section 11–2503(a). I would adopt the Hearing Committee's conclusion that the respondent's conduct did not involve "moral turpitude" within the meaning of D.C.Code section 11–2503(a) but that it was "illegal conduct involving moral turpitude" within the meaning of D.R. 1–102(A)(3).

Since the decision of the Court of Appeals in *In the Matter of Colson*, 412 A.2d 1160, 1163–68 (1979), which brought to an end an era during which section 11–2503(a) of the D.C.Code was largely ignored, this Board and its Hearing Committees have struggled with the application of this statute. The Court, in *Colson* and subsequently, has recognized that it should be given a very narrow application and that only conduct which is "base" or "vile" should come within its terms. Nonetheless, we have had to deal repeatedly, since *Colson*, with the question of whether particular statutes, on their face, involve moral turpitude and, if not, whether conduct in violation of those statutes involved moral turpitude.

The statute is a rather unusual one. Most states have a statute that makes conviction of a felony grounds for disbarment, without requiring an elaborate hearing. The objection has been raised to these statutes that conviction of certain felonies, while serious enough to warrant severe penalties, does not necessarily imply that the person is not fit to practice law or call in every case for a sanction as serious as disbarment. One example is involuntary manslaughter. The solutions that have been proposed include limiting the grounds for discipline to conviction of a felony that adversely reflects upon a person's fitness to practice law or to a conviction of a felony involving moral turpitude, and authorizing the Court to impose sanctions ranging from censure to disbarment. This is satisfactorily accomplished by D.R. 1–102(A)(3) which prohibits engaging in "illegal conduct involving moral turpitude that adversely- reflects on . . . fitness to practice law."

The Court of Appeals has ample statutory authority in this area, even without regard to its inherent power to regulate the membership in its bar. Section 11–2501(a) of the D.C.Code authorizes the Court to "make such rules as it determines proper respecting the examination, qualification, and admission of persons to membership in this bar and their censure, suspension, and expulsion." Section 11–2502 provides some-

6. See footnote 4, *supra*.

what more specific overlapping authority to "censure, suspend from practice, or expel a member . . . for crime, misdemeanor, fraud, deceit, malpractice, professional misconduct, or conduct prejudicial to the administration of justice." Pursuant to these two sections, the Court has adopted Rule X of the Rules of the District of Columbia Court of Appeals Governing the Bar of the District of Columbia, which makes the ABA Code of Professional Responsibility (as amended by the Court) ("Code")—including D.R. 1–102(A)(3)—applicable to this bar. Also pursuant to sections 11–2501(a) and 11–2502, the Court has adopted Rule XI, which sets out additional disciplinary rules to give effect to the Code's provisions. Among these disciplinary rules are Rule XI, sections 2 & 3, which allow disbarment for violations of the Code, and Rule XI, section 21(5), which allows a disbarred attorney to petition for reinstatement after five years, and allows reinstatement provided that it is shown by clear and convincing evidence that reinstatement is in the public interest.

Section 11–2503(a), on the other hand, has been troublesome because it requires rather than permits disbarment—in contrast with its predecessor, Section 11–1303 of the 1961 edition of the D.C.Code—and because it bars reinstatement unless the lawyer obtains a Presidential pardon. As just explained, our disciplinary system would function quite well if this section were simply to be repealed. More importantly, it seems to restrict unnecessarily the court's discretion to discipline, by imposing a kind of "super disbarment." This has led me, and some other members of the Board, to conclude that it should be given an extraordinarily restrictive interpretation and that the same language in D.R. 1–102(A)(3) should be read more expansively.

Looking, for example, at the facts in this case, if we are free to recommend what we believe to be an appropriate sanction, I feel no constraint in concluding that exacting a fee from an indigent person, knowing that it is illegal and improper to do so, is conduct that, for a lawyer, involves moral turpitude. I do feel constrained about reaching such a conclusion if the necessary result is the imposition of the Draconian sanction required by Section 11–2503(a).

A majority of the Board believes that this interpretation of the two disciplinary provisions is precluded by the opinion of the Court of Appeals in *In the Matter of Colson,* 412 A.2d 1160, 1163–64 (D.C.1979). There, the Court assumed that since the Board had found the respondent to have violated D.R. 1–102(A)(3), it followed that he had also violated D.C.Code section 11–2503(a). A similar assumption was made in *In the Matter of Kerr,* 424 A.2d 94, 97 & n.14 (D.C.1980), where the Court concluded that the Board's finding of moral turpitude under D.R. 1–102(A)(3) "compelled [Ms. Kerr's] disbarment under the clear language of the statute [section 11–2503(a) ]." *Id.* at 97. I am not persuaded, however, that the Court has yet been urged explicitly to consider the possibility that the phrase "moral turpitude" might properly be given a different meaning under the statute and under the Disciplinary Rule. The question was not raised in either *Colson* or *Kerr.* In *Colson,* only the *amicus curiae,* Mr. Douglas, raised the possibility that the Court might be compelled to disbar Mr. Colson under section 2503(a)—and he dismissed further discussion of the issue as serving no useful purpose. 412 A.2d at 1176. In *Kerr,* the petitioner seems to have presumed that in disbarring her for an act involving moral turpitude under D.R. 1–102(a)(3), the Court was implicitly acting under the statute as well. 424 A.2d at 97 n.14. I do not, therefore, believe that the Court has expressly foreclosed the interpretation of the two provisions that I am now suggesting. Accordingly, I have chosen to set out the reasons for my position at some length.

### III

Some of the reasons for my present position were stated in my concurring opinion in *In re Fodiman* (July 10, 1979), and I repeat them here for ease of reference.

[D]isbarment of an attorney is, by definition, a severe penalty for misconduct. . . .
[W]e should move with caution when we

consider recommending this Draconian sanction. "[T]he profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise. The right to exercise it ought not to be lightly or capriciously taken from him." *Ex Parte Burr*, 22 U.S. (9 Wheat.) 529, 529 [6 L.Ed. 152] (1824) (Marshall, C.J.).

Even though the major purpose of disciplinary proceedings against attorneys is to guarantee the public "the continued fitness of a lawyer to practice his profession," *District of Columbia Bar v. Kleindienst*, 345 A.2d 146, 147 (D.C.1975), it is equally true that "[d]isbarment ... is a punishment or penalty imposed on the lawyer." *In Re Wild*, 361 A.2d [182,] 183, 184 (D.C.1976) (*quoting from In Re Ruffalo*, 390 U.S. 544 [88 S.Ct. 1222, 20 L.Ed.2d 117] (1968)). Since statutes providing for the suspension or disbarment of an attorney are penal in their impact, age-old maxims of statutory construction command that such statutes be construed strictly. *Moutrary v. People ex rel. Morris*, 162 Ill. 194, 44 N.E. 496, 498 (1896).

The strict construction of penal statutes is "a rule deriving sustenance from considerations more ancient than the Nation itself." *Zaimi v. United States*, 476 F.2d 511, 523–24 (1973); *see also United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 [5 L.Ed. 37] (1820) (Marshall, C. J.). Concerns for individual rights and freedoms and for the proper roles of Congress and the courts have nourished this maxim and established a "rule of lenity." As stated by Justice Frankfurter in *Bell v. United States*, 349 U.S. 81, 83 [75 S.Ct. 620, 622, 99 L.Ed. 905] (1955):

"When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity .... It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment."

Accord, *United States v. Naftalin*, 47 U.S. L.W. 4574, 4577 (U.S. May 21, 1979) [441 U.S. 768, 774, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624] (dictum); *United States v. Bass*, 404 U.S. 336, 347 [92 S.Ct. 515, 522, 30 L.Ed.2d 488] (1971); *National Staffing Consultants, Inc. v. District of Columbia*, 211 A.2d 762, 763 (D.C.1965).

Permanent disbarment has never been a favored discipline for members of the bar. *See, e.g., Ex Parte Burr*, 22 U.S. (9 Wheat.) 529 [6 L.Ed. 152] (1824) (Marshall, C. J.); *Jackson v. State Bar*, 23 Cal.3d 509, 591 P.2d 47, 153 Cal.Rptr. 24 (1979). The permanence of the punishment suggests that the attorney can never be expected to perform at acceptable levels of morality and competence. Permanent disbarment implies that the disciplined attorney is incapable of rehabilitation, and that society can be protected only by professional banishment. Such economic capital punishment can almost never be justified.

Even a lesser discipline than permanent disbarment has been recognized to be most severe. As Justice Jackson [1] wrote in vindicated dissent in *In Re Isserman*, 345 U.S. 286, 294 [73 S.Ct. 676, 680, 97 L.Ed. 1013] (1953), *rev'd per curiam*, 348 U.S. 1 [75 S.Ct. 6, 99 L.Ed. 3] (1954):

"If the purpose of disciplinary proceedings be correction of the delinquent, the courts defeat the purpose by ruining him they would reform. If the purpose be to deter others, disbarment is belated and superfluous, for what lawyer would not find deterrent enough in the jail sentence, the two-year suspension from the bar of the United States District Court, and the disapproval of his profession?"

. . . .

"... [T]o permanently and wholly deprive one of his profession at [this attorney's] time of life, and after he has paid so dearly for his fault, im-

---

1. Justice Jackson was joined in his dissenting opinion by Justice Black, Justice Douglas and Justice Frankfurter.

presses us as a severity which will serve no useful purpose for the bar, the court or the delinquent."

It thus seems clear that we should interpret Section 11–2503(a) narrowly and apply this super disbarment sparingly.

## IV

As I also argued in *In re Fodiman*:

Other methods of statutory construction remind us to look to the entire scheme of attorney discipline when we interpret Section 11–2503(a). "[T]he meaning of a statute is to be looked for, not in any single section, but in all the parts together and in their relation to the end in view." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 439 [55 S.Ct. 241, 256, 79 L.Ed. 446] (1935) (Cardozo, J., dissenting). As stated above, D.C.Code Sections 11–2501(a) and 11–2502 provide the Court of Appeals with the power to censure, suspend or expel a member of the bar for a variety of reasons. These provisions recognize the Court's inherent power to regulate and discipline the bar. *E.g., Ex Parte Wall*, 107 U.S. 265, 273 [2 S.Ct. 569, 575, 27 L.Ed. 552] (1882); Lee, *The Constitutional Power of the Courts over Admission to the Bar*, 13 Harv.L.Rev. 233 (1899). It follows that the Disciplinary Rules of the Court of Appeals, established pursuant to this legislative delegation and to the Court's inherent power, stand on the same level as Section 11–2503(a). The necessary implication is that Section 11–2503(a), which punishes offenses involving moral turpitude, is only a part of a general scheme for the regulation and discipline of the bar and therefore must be interpreted in the context of the entire plan.

Of course, different parts of the same statute, and even different statutes, are to be interpreted, if possible, to be consistent and to give effect to each. That may be accomplished in this case by limiting the scope and reach of Section 11–2503(a). Only if "moral turpitude" is given the narrowest possible interpretation can the provision of Sections 11–2501(a) and 11–2502 and Rule XI be given appropriate effect and provide the flexibility that was evidently intended. The existence of these other means of discipline compels a narrow reading of Section 11–2503(a) and of "moral turpitude" in this context.

There is no similar reason why the words "moral turpitude" as they are used in D.R. 1–102(A)(3) must be read in a comparably narrow way. We need not "'make a fortress out of the dictionary' ... by mechanically applying definitions in unintended contexts." *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 764, 69 S.Ct. 1274, 1279, 93 L.Ed. 1672 (1949) (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (1945)). "[M]ost words admit of different shades of meaning, susceptible of being expanded or abridged to conform to the sense in which they are used." *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87, 55 S.Ct. 50, 51, 79 L.Ed. 211 (1934). As the United States Supreme Court explained in *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 608, 76 L.Ed. 1204 (1932), "[i]t is not unusual for the same word to be used with different meanings in the same act."

"Where the subject matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed." *Id.*

Examples of such varying interpretations of the same word or phrase are readily found. In the *Farmers Reservoir* case, quoted above, the Court held that the word "production" excluded the collection, storage and distribution of water in section 13(a) of the Fair Labor Standards Act even if it included such activities in section 3(j); in the *Stockholms Enskilda* case, that the words "interest on ... interest-bearing ob-

ligations" included interest on a tax refund for purposes of section 217(a) of the Revenue Act of 1926, but not for purposes of section 213(b)(4); in *Atlantic Cleaners* that a cleaning, dyeing and renovating service was engaged in a "trade or commerce" for purposes of section 3 of the Sherman Act, even if not for purposes of section 1; and in *Lawson v. Suwannee Fruit & Steamship Co.*, 336 U.S. 198, 201, 69 S.Ct. 503, 504, 93 L.Ed. 611 (1949), that the word "disability" includes nonindustrial injuries under section 8(f)(1) of the Longshoremen's and Harbor Workers' Compensation Act, even if the definition of the term in section 2(10), applicable to the rest of the Act, does not. Most recently, in *Lehman v. Nakshian*, 453 U.S. 156, 158, 101 S.Ct. 2698, 2702, 69 L.Ed.2d 548 (1981), the Court held that the phrase "such legal . . . relief as will effectuate the purposes of this chapter" does not grant a right to a jury trial against the United States in section 7(c) of the Age Discrimination in Employment Act, even if it does against private parties in section 15(c). Nor have the lower federal courts failed to heed the Supreme Court's example. In *Kennecott Copper Corp. v. Train*, 526 F.2d 1149, 1154 (9th Cir. 1976), for example, the court observed that "if the overall purpose of Congress would be better served by construing the term [emission limitations] to include intermittent controls and tall stacks in § 1857h–2(a)(1) [of the Clean Air Act] and to exclude them in a 1857c–(a)(2)(B), there is no reason this reading cannot be adopted." Similarly, in *United States v. Brewer*, 360 F.2d 112, 116 (3d Cir. 1966), it was held that the word "realization" does not mean the same as "recognition" in section 117(m)(2)(A)(ii) of the Internal Revenue Code, even if it does in section 341(b)(1); in *Grand Lodge of Int. Ass. of Machinists v. King*, 335 F.2d 340, 344 (9th Cir. 1964), that the words "otherwise discipline" include removal from union office in section 101(a)(5) of the Labor-Management Reporting Disclosure Act, but not in section 609; and in *Whittaker v. Whittaker, Corp.*, 639 F.2d 516, 526 (9th Cir. 1981), that the words "beneficial ownership" include certain indices of control under 16(b) of the

Securities Exchange Act of 1934, but not under section 16(a).

The *Whittaker* case is particularly instructive for our purposes. Section 16(a) of the Securities Exchange Act of 1934 provides that every "person who is . . . the beneficial owner of more than 10 per centum of any class . . ." of securities registered under the Act must file current reports of purchase and sales of the securities of the issuer. Section 16(b) states that any profit realized "by such beneficial owner" from transactions within a six-month period must disgorge the profit, plainly a much more severe sanction than having to file a report. In *Whittaker*, the court recognized that the words "beneficial ownership" should properly have a broad meaning for purposes of the reporting requirement imposed by subsection 16(a) of the Act. It felt obliged, nonetheless, despite the direct cross-reference in Section 16(b) to the preceding section, to construe narrowly the same words in subsection 16(b). In doing so, the court quoted approvingly from *Whiting v. Dow Chemical Co.*, 523 F.2d 680, 685 n.8 (2d Cir. 1975): "A definition of 'beneficial ownership' may be broad enough to require reporting for purposes of public exposure but too broad for the imposition of liability under § 16(b)." 639 F.2d at 526. Thus, where Congress had imposed a particularly severe penalty upon certain types of conduct, it was found appropriate to construe narrowly the operative language, notwithstanding the broader meaning given to the same language where it did not lead to a similarly severe penalty. The analogy with the problem before us should be clear. Moreover, in its Securities Exchange Act Release No. 34–13291, Fed.Sec.L.Rep. ['76–'77 Transfer Binder] ¶ 80,900 (Feb. 1977) at p. 87,576, the SEC carefully stated that although it had defined the words "beneficial ownership" for purposes of Section 13(d) of the Act, that definition would not apply to the same term in Section 16. Thus the term "beneficial owner" means one thing for purposes of Section 13(d), another thing for purposes of Section 16(a)

and still another for purposes of Section 16(b).

The interpretation of "moral turpitude" that I am suggesting here would not, strictly, require the Court to interpret two sections of the Court Reform Act differently. As explained earlier, D.R. 1–102(A)(3), in which the words "moral turpitude" are used, is one of a large body of rules—the Code of Professional Conduct—which was adopted by the Court pursuant to sections 11–2501(a) and 11–2502 of the D.C.Code, presumably with constructive knowledge of the use of the same words in section 11–2503(a) of the D.C.Code. This difference adds further support to the suggested interpretation. On the one hand, absent any contrary congressional intent, the Court is free to construe narrowly the harsh disbarment requirement found in section 11–2503(a), in accordance with the well-established rule that penal statutes should be strictly construed, discussed in the previous section. On the other hand, the Court is under no special constraints in interpreting a rule which it, itself, has promulgated. What it could have done by expressly defining the phrase "moral turpitude" in the body of the promulgated rules, it can also do by way of interpretation. It is entirely appropriate, therefore, for the Court to adopt different interpretations for the words "moral turpitude" in the two contexts.

## V

The result that the majority comes to in this case illustrates, I believe, the troublesome fruits of the unitary interpretation of the phrase "moral turpitude" in these two provisions. Our past decisions, and at least my own present intuitions, would suggest that the respondent's offense is one involving "moral turpitude," although not one warranting "super disbarment." In *In Re Foshee*, Bar Docket 240–74B (April 12, 1976), for example, before we were instructed by the Court of Appeals that we should be applying Section 2503(a), we found that an attorney who had committed the same offense as the respondent here *had* violated D.R. 1–102(A)(3)—had, that is, committed an act involving moral turpitude—and we recommended an even lighter punishment than that recommended here. This recommendation was approved by the Court in an unpublished Memorandum Opinion. *In re Foshee*, No. S–48–77 (D.C.App., March 17, 1977). See also discussions in *Colson*, 412 A.2d at 1174 and 1181 n.4. Here, however, in order to retain its discretion to recommend such a punishment, and avoid the Draconian sanction of "super disbarment" that it believes must now follow under section 11–2503(a) from a conclusion that this conduct involves moral turpitude, the majority was compelled to the conclusion that respondent's conduct does not involve moral turpitude.

I suggest that so long as the Board feels compelled to assume that "moral turpitude" means the same thing under both sections 11–2503(a) and D.R. 1–102(A)(3), it will be most reluctant to find that any conduct involves moral turpitude, unless clearly instructed that it does by the Court. In this case, that conclusion was less difficult because of the fact that the respondent was also found to have violated D.R.s 1–102(A)(4) and 1–102(A)(5), and these violations were sufficient alone to ground the Board's disciplinary recommendation under Rule XI, sections 2 & 3. The conclusion might have been more difficult had these other disciplinary rules not been available to the Board. There may well be instances in which we will find ourselves sitting in judgment of conduct that other disciplinary rules do not cover. Assuming that a finding that the conduct involves "moral turpitude" would necessarily lead to "super disbarment," we would be faced with the Hobson's choice of recommending a sanction that we regard as far too harsh or recommending no sanction at all.

In sum, while there is language in *Colson* and *Kerr* which strongly implies that the term "moral turpitude" should be given the identical meaning in D.R. 1–102(A)(3) that

it has in Section 11–2503(a), I believe that this question deserves re-examination and careful consideration by the Court. Section 11–2503(a) should be reversed for conduct so egregious or reprehensible that disbarment is an inadequate sanction—that "super disbarment" is called for—while D.R. 1–102(A)(3) should be preserved as a separate disciplinary rule, covering all types of conduct that all of us regard as wholly unacceptable for members of the bar. I urge the Court to find the respondent has violated D.R. 1–102(A)(3), but not section 11–2503(a).

/s/ Lawrence J. Latto
LAWRENCE J. LATTO

October 20, 1981

Mr. Snyder joins in this opinion.