842 F.2d 773
 OCEANIC BUTLER, INC., and National Union Fire Insurance
Company of Pittsburgh, Pennsylvania, Petitioners,
v.
Stig B. NORDAHL and Director, Office of Workers'
Compensation Programs, Respondents.
 No. 87-4488.
 United States Court of Appeals,
Fifth Circuit.
 April 19, 1988.
 
 Thomas C. Fitzhugh, III, Fitzhugh & Filteau, Houston, Tex., for petitioners.
 Gilbert T. Adams, Jr., Richard J. Clarkson, Beaumont, Tex., Joshua T. Gillelan, II, William C. Jacobs, Director, Office of Workers Compensation Programs, Donald Shire, Assoc., Sol., Washington, D.C., for Nordahl.
 Petition for Review of an Order of the Benefits Review Board.
 Before GARZA, HIGGINBOTHAM and SMITH, Circuit Judges.
 JERRY EDWIN SMITH, Circuit Judge:
 
 
 1
 Petitioners Oceanic Butler, Inc., and National Union Fire Insurance Company, its workers' compensation insurer under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. Sec. 1333(b) (1982), and the Longshore and Harbor Workers' Compensation Act (LHWCA), seek review under LHWCA Sec. 21(c), 44 Stat. 1439, 33 U.S.C. Sec. 921(c), of the Benefits Review Board's decision, 20 B.R.B.S. 19 (1987), upholding a compromise-and-release settlement of lifetime disability claims entered into by them with Stig B. Nordahl, now deceased. They claim an employers'/insurers' right of withdrawal from "proposed" settlements prior to the administrative approval required by LHWCA Secs. 8(i) and 16. The Labor Department's Director of the Office of Workers' Compensation Programs has taken over defense of this appeal for Nordahl's estate and contends that National Union's submission of the settlement did not reserve a right of withdrawal before administrative approval and that administrative authority to approve the settlement was unaffected by the disabled employee's death before approval. Agreeing with the agency in this case of first impression, we AFFIRM.
 
 
 2
 I. THE DISPUTE.
 
 
 3
 In 1985, longshoreman Nordahl settled a disputed claim of permanent (the insurer says temporary) total disability for $75,000 and died exactly a week later. For temporary disability he had been receiving, and would have been entitled (for life, if necessary) to, $308.51 per week. If the administrator had found the total disability to be a permanent one (a claim waived in the settlement), the payments would have been above $360; at that rate, the $75,000 settlement compensated him for the equivalent of only three and one-half years' longevity.[1]
 
 
 4
 While the written agreement and release were properly submitted for approval, the administrative authority of course did not have time to act before Nordahl's death. The claims examiner first granted National Union's requests for postponements of consideration of the submitted compromise and release and then passed the file up to the Deputy Commissioner after the carrier made known its intent to withdraw from the agreement.
 
 
 5
 During this time, there was no suggestion that death removed administrative jurisdiction to approve the settlement. Even now, the companies assert in the alternative that it was not jurisdiction to disapprove or approve that was wrongful, but that administrative competence rested with the administrative law judge (ALJ), not with the Deputy Commissioner.
 
 
 6
 The fallaciousness of this jurisdictional challenge is betrayed by statutory text, but the specific question was also clearly adjudicated by the Benefits Review Board in Maher v. Bunge Corp., 18 B.R.B.S. 203 (1986). In that case, death of the claimant was held not to bar subsequent approval of a submitted settlement, and an attempted withdrawal by the insurer was disallowed. The Deputy Commissioner recognized that she was bound by this recent Review Board decision, denied consent to withdrawal, and approved the pre-submitted settlement. The Board affirmed the Deputy Commissioner's order. National Union has not paid the $75,000 plus interest, despite administrative notice to do so.
 
 
 7
 The widow has filed a separate claim for death benefits, which National Union asserts cannot be awarded because death was not injury-related. National Union also contends, however, that such a death claim forecloses approval of the disability settlement because it would threaten double recovery if both claims were not placed before the same ALJ. The carrier asserts further that consideration of the disability and death claims in one proceeding would be more efficient and expeditious.
 
 
 8
 II. THE LEGISLATION.
 
 
 9
 The provision directly at issue involves the necessity of administrative approval for compromise agreements; the question is whether each party to a compromise agreement has the right to withdraw unilaterally from that agreement if it does so prior to the requisite administrative approval. Section 8(i)(1) of the Act states:
 
 
 10
 Whenever the parties to any claim for compensation under this Act, including survivors benefits, agree to a settlement, the deputy commissioner or administrative law judge shall approve the settlement within thirty days unless it is found to be inadequate or procured by duress. Such settlement may include future medical benefits if the parties so agree. No liability of any employer, carrier, or both for medical, disability, or death benefits shall be discharged unless the application for settlement is approved by the deputy commissioner or administrative law judge. If the parties to the settlement are represented by counsel, then agreements shall be deemed approved unless specifically disapproved within thirty days after submission for approval.[2]
 
 
 11
 The Petitioners here assert that Maher involved an application of the old version of section 8(i) and that "the requirements for approval under the 1984 amendments are significantly different from those employed to review pre-1984 settlements." While it is true that the old "best interests" standard was changed to a test of adequacy and lack of duress, the Board below noted that Maher found its result "consistent" with either version of the provision.[3]
 
 
 12
 This is a conservative reading of Maher, which did decline to apply the amendments retroactively but also noted "that the amendments effect a policy encouraging a view that settlement agreements have a binding effect." 18 B.R.B.S. 203, 204-05 n. 3. Additionally, any fair reading of the changes reveals that the policy was to strengthen worker protection against unwise settlements, while making approval mandatory, absent clear prejudice to future support for the worker and his or her dependents.[4]
 
 
 13
 The extensive interpretation of the statutory provision by the agency charged with its enforcement and execution merits considerable weight. United States v. American Trucking Association, 310 U.S. 534, 550, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 (1940). The carrier's main assertion seems to be that the amendments, while making approval mandatory absent clear inadequacy, did not display any preference to bind one side only, whereas the earlier versions were more heavily biased in favor of protecting the claimant.
 
 
 14
 III. CAN THE CARRIER WITHDRAW?
 
 
 15
 Thus the question under section 8(i) is whether either party may withdraw from a compromise-and-release settlement prior to the necessary administrative approval, or whether the employer and insurer are bound and the approval requirement permits only the worker a period for reconsideration. Some support for the former reading is provided by the 1984 amendments to the section that changed the standard of approval to mere "adequacy" from the more stringent "best interests of [the] injured employee."
 
 
 16
 The language of the provision was previously asymmetrical in its protection of the beneficiaries of the Act. The language now is less clearly so.
 
 
 17
 National Union contends that inadequacy of compensation for claimants or inadequacy of consideration for insurers equally demands administrative disapproval of proposed settlements. However, the legislative history of the 1984 amendments does not evince any intention to alter the former biased protection so drastically, for examination of the LHWCA as a whole clearly shows that the basic asymmetry against employers and insurers was unaffected by the change from subjective evaluations of the claimant's best interest to actuarial adequacy.
 
 
 18
 Section 8(i) is not the only provision restricting the contractual rights of the parties to workers' compensation claims. There are, scattered throughout the Act, several prohibitions on the release of insurers' liability, the cumulative effect of which is to limit to claimants only the right to rescind unapproved settlements. The statutory terms, structure, and purpose of the LHWCA establish a clear paternalism required of the agency and of reviewing courts toward employees willing to waive lifetime claims for an immediate payment.
 
 
 19
 For instance, LHWCA Sec. 15(b) invalidates any release by a disabled worker of future compensation entitlements unless there is Sec. 8(i) approval. Section 16, as originally enacted and never changed, provides:No assignment, release, or commutation of compensation or benefits due or payable under this Act, except as provided by this Act, shall be valid....
 
 
 20
 44 Stat. 1434, 33 U.S.C. Sec. 916 (emphasis added).
 
 
 21
 Unlike many of the state statutes at issue in the cases detailed by National Union, the LHWCA contains no general provision invalidating insurers' agreements for payment until and unless approved. Rather, sections 15(b) and 16 render "invalid" only the claimant's agreement to waive or compromise accrued or future benefit rights. Similarly, section 8(i) precludes an agreement from "discharg[ing]" liability of the employer or insurer unless approval is obtained as provided in section 8(i).
 
 
 22
 Setting aside for the moment the problem exemplified by the present case (the claimant's death after execution of the settlement agreement but before approval), the LHWCA's provisions thus require different analyses of the parties' rights under a settlement agreement. The claimant's obligation under the contract--to accept the sum agreed upon and to waive the lifetime compensation otherwise payable under the terms of the Act--is invalid when made and cannot become binding until and unless the contract is administratively approved.
 
 
 23
 The insurer's obligation under the agreement--to pay the designated sum in exchange for a release of the liability that would otherwise result under the Act's terms--is not rendered invalid by anything in the LHWCA. This is the direct opposite of the New York compensation scheme upon which National Union wishes to rely by analogy.[5]
 
 
 24
 Of course, the insurer's obligation to perform what it has agreed to do--to pay a lump sum--can be, and is, conditioned upon administrative approval of the agreement. If the settlement should be disapproved, there is a failure of the consideration for the agreement--a release of the disabled worker's lifetime benefits.
 
 
 25
 National Union incorrectly asserts that, if this were not a regulated contract, there would be a failure of consideration under the circumstances, because the carrier has no present burden of future payments once a claimant dies. Though governing legal standards (such as administrative disapproval) may make a promise (to release future benefits upon receipt of an approved lump-sum payment) void or voidable, there is nothing that makes that promise invalid consideration at the time it is made. Restatement (Second) of Contracts Sec. 78. And so long as there is valid consideration, there is nothing requiring mutuality of bargain even in unregulated contracts. Id., Sec. 79.
 
 
 26
 The sufficiency of the claimant's voidable promise as consideration for the insurer's binding obligation is judged when made and is impaired only after disapproval. The natural operation of the Act does not create a failure of the consideration given in promising to release disputed accrued payments and future disability benefits.
 
 
 27
 Statutory invalidation of the claimant's release of the potential right to a greater amount of compensation obviates performance after disapproval. But the promise to pay if approval is granted is valid and binding when made, and nothing in the statute authorizes its rescission by the carrier. Nor did National Union contractually protect itself by some reservation of withdrawal rights in the event of pre-approval death; it simply "agree[d] to make such lump-sum payment upon approval."[6]
 
 
 28
 Since there is no right of rescission in the statute or in the contract, and no per se invalidity to the promise to pay curable only by approval, the insurer is without an avenue of escape from its deal. While revised section 8(i) may be ambiguous as to whom the adequacy-of-the-settlement test is addressed, the absence of any counterparts to the liability "discharge" in that subsection, and the "invalidity" provisions of sections 15(b) and 16, make clear that the asymmetry survived amendment in 1984. Absent some statutory protection for the carrier or a reservation of rights in the settlement agreement, the disadvantage imposed upon National Union is not subject to relief.
 
 
 29
 This disparity leads directly to the general administrative construction that, absent contrary provisions in the contract, executed settlement agreements submitted for administrative approval are binding upon the employer or insurer and not subject to rescission at their election; on the other hand, the agency feels that such submitted settlements are not binding upon claimants, and are subject to rescission by them, until approved, because of the statutory asymmetry of treatment.
 
 
 30
 This proposition not only finds support in the statutory difference in contractual capacities between the parties, but is also supported both by the purpose of the Act's remaining restrictions upon compromise-and-release lump-sum settlement agreements and by the nature of the bargain such agreements represent. The paternalistic perception held by compensation agencies, courts, and the Congress is apparent in their expressed view of the nature of the settlement bargain. The public policy justifications for asymmetrical treatment of claimants as against carriers can thus be seen without reference to the state law cases.
 
 
 31
 Indeed, because there are no statutory restrictions upon employers and their carriers being bound from the time they sign the agreement, and because there usually are no express reservations of a right of rescission in the settlement documents, the policy argumentation engaged in by both sides is actually unnecessary to establish alternately that the legislative goals behind the Act allow for bias in favor of claimants. It is not that asymmetric treatment can be tolerated because of public policy, but that there was no symmetry created in the settlement-approval provisions, or in the contract negotiated, in the first place.
 
 
 32
 The unambiguous purpose of allowing claimants to withdraw from submitted, but unapproved, settlements and of the approval requirement itself, nonetheless, clearly is protection of the claimants', and the public's, interest in preserving them and their families from destitution and consequent reliance on the taxpaying public. That interest is not left for the employee alone to protect: The Act's administrators have the statutory responsibility of second-guessing the claimant (even if represented by counsel) on whether the lump-sum payment will likely prove "inadequate," under the current standard, or whether it is "for the [employee's] best interests," under the former version of section 8(i).[7]
 
 
 33
 As the government explains, this agency responsibility is there to protect claimants, who are typically unskilled and untutored in actuarial principles (and frequently awed by large amounts of cash), from bargains that are not reasonably likely to be in their long-term interests. There is no public policy need for insurers to be afforded similar protection against their own poor judgment: Their claims representatives and attorneys are experienced negotiators with actuarial principles firmly in mind.[8]
 
 
 34
 Typically, as here, the value of the claimant's rights under the Act depends upon a compound estimate of life expectancy and the extent of continuing disability in the future. Perhaps also expecting to achieve a better return on investment of the lump sum than the discount factor posits, the employee is gambling that the injury will not be as debilitating as the insurance company expects or that he or she would not survive to collect periodic benefits for as long as the carrier expects.
 
 
 35
 Conversely, the carrier is gambling (with an overall winning history) that claimants will have less earning capacity on the open labor market than they expect, or will survive longer than statistically predicted, and, perhaps, that the claimants are applying an overly optimistic discount rate in evaluating their future rights. As the government eloquently argues, the benefit to the insurer in settling is protection against the possibility of paying disability compensation for decades if the disabled worker turns out to be long-lived.
 
 
 36
 Consequently, changes of conditions that reduce or eliminate the likelihood that the bargain is a good one for the insurer will generally show up sooner. Achievement of better recovery (or less economic impact) from the injury than expected, or death sooner than predicted, will reveal themselves before the lump sum is exhausted.
 
 
 37
 A bad bargain for the claimant, however, will show up only at the end of the otherwise compensable period. The injury may become more disabling with time, and the employee may live beyond his life expectancy at the time of settlement. There is no way to allow rescission of a lump-sum settlement if it turns out to be a disastrous bargain for the claimant, which would generally become apparent only many years after approval, payment, and discharge of liability.
 
 
 38
 The government is absolutely correct that treating the period from execution of a section 8(i) settlement until it is approved as a grace period, during which the insurer may withdraw from the agreement so as to preclude its approval, would allow it the advantage of a post-agreement period of reevaluation more valuable to it than the claimant's preapproval right of withdrawal. Just as insurers would not be allowed to come to an ALJ to establish that they had agreed to too high an amount based upon medical improvement or similar post-submission developments, they cannot be allowed to assert that the deal they struck was inadequate under current circumstances because the claimant's death proves they would have owed less than the amount due in the lump-sum payment.
 
 
 39
 Accordingly, it seems not inappropriate as a matter of policy to hold insurers to their bargains once they have entered into them.[9] If National Union had wished to protect itself in the event that Nordahl died before payment, it should have provided for that possibility in the agreement it wrote, with looser language than "[We] agree to make lump sum payment upon approval."
 
 
 40
 Nothing in the LHWCA prevents insurers from including in settlement agreements an express right of rescission during the preapproval period. While such a clause might alarm certain claimants, carriers insert other self-serving provisions into settlements seemingly with little adverse impact upon their ability to negotiate favorable compromise-and-release agreements.
 
 
 41
 IV. WAS THERE AN ABUSE OF DISCRETION IN APPROVING THE SETTLEMENT?
 
 
 42
 Administrative approval of settlements is reviewed only for an abuse of discretion.[10] National Union argued below, and asserts again on appeal, that the agreement was "inadequate" within the meaning of the statute. However, the elements of the approval application that supposedly impair enforcement under agency regulations were examined and passed upon by the Review Board in its opinion upholding the Deputy Commissioner's order:Despite employer's contentions, the settlement ... does in fact address these issues. Specifically the agreement indicates that the settlement represents a compromise of the parties' differences as to the nature and extent of claimant's disability, ... whether or not claimant can return to work [, ... and m]oreover, includes an explicit discussion of the matter of the probability of success if the case were to be litigated. At oral argument, counsel for employer and carrier conceded ... that there had been no question as to the settlement's adequacy at the time the agreement was executed, that it constituted a contract between the parties, and that it was a fair agreement so long as the claimant was alive.
 
 
 43
 20 B.R.B.S. 18, 22 (1987); see 20 C.F.R. Sec. 702.242(a) and (b).
 
 
 44
 Adequacy is also allegedly proven by the fact that Nordahl's demise at so early a point makes the settlement a virtual windfall for his widow. Since hindsight shows he would have received far less than $75,000, it is true that the settlement was more than adequately pegged to the sum to which he would have been entitled, had there never been a release of periodic payments. The government, however, exaggerates the narrowness of the consideration given applications and engages in some hyperbole in arguing that far from furnishing a ground for rescission the insurer otherwise had no right to make, the disabled worker's early death conclusively demonstrated that the settlement amount was entirely "adequate" and entitled to approval.
 
 
 45
 This would seem conclusively to dispose of the argument, because there was also no allegation that the mandatory approval could be denied because Nordahl's consent had been procured by duress. Absent the statutory grounds for disapproval, the only escape would be through withdrawal. Since the above discussion indicates that the insurer at least never had such an option, either the Deputy Commissioner or an ALJ had to find that the agreement comported with section 8(i)(1).
 
 
 46
 V. SHOULD APPROVAL HAVE BEEN CONSOLIDATED WITH THE WIDOW'S
 
 
 47
 DEATH BENEFITS CLAIM?
 
 
 48
 National Union next contends that even if the highly deferential review of agency approval validates the administrative conclusion of "adequacy," procedural flaws below require remand for proper adjudication. This argument fails because there clearly was no prejudice, even if the procedures utilized had been defective, which they were not.
 
 
 49
 The policy justifications on which National Union rests most of its prudential arguments for consolidation are basically the same as those purportedly backing bilateral withdrawal before approval. The carrier reads section 8(i) as placing primary approval jurisdiction with ALJs and emphasizes an alleged duplication of litigation in agency determination of the current death-benefits application.[11] The spectre of a "double recovery" for the widow is also ominously raised.
 
 
 50
 National Union admits that the 1984 amendments allowed for traditional section 8(i) approval by ALJs or expedited approval by the Deputy Commissioner. See, supra note 3. There is positively no support for the assertion that the employee's death required the decision on the approval application to be referred back to an ALJ regardless of other pending proceedings chosen by the parties.
 
 
 51
 It is true that section 8(i) provides for submission of settlements to the ALJ that has handled the file up to the point at which agreement was reached and that section 19(d) and 20 C.F.R. Sec. 702.301 provide for formal hearings to develop necessary records, but the parties here applied for the "expedited" approval of the Deputy Commissioner.[12] Besides keeping them to the route they chose, the court should not allow National Union to succeed on this point because purely legal questions would have been, or at least should have been, referred by the ALJ to the superior authority.[13]
 
 
 52
 Additionally, as stated previously, the earlier Maher ruling disposed of any question about the legal effect of the worker's death. Such legal rulings by either an ALJ or the Deputy Commissioner, furthermore, receive the same plenary review by the Board and ultimately the courts of appeals. Starting one rung lower on the ladder could not have affected the results of reviewing bodies. Referral of the disability settlement to an ALJ for action would merely have produced additional delay, without the possibility of a different outcome.
 
 
 53
 The government persuasively argues that the settlement-approval proceedings presented exclusively an issue of pure law and so required no factfinding by an ALJ. Thus not only would the legal issues have had to have been transferred by an ALJ for higher-level consideration, but there were no evidentiary questions in dispute requiring presentation to an ALJ at a section 19(d) hearing. It is illogical, and would be inefficient, to have consolidated with the widow's claim for death benefits (which presents factual medical-opinion questions) a reexamination of the legal question of whether the insurer could validly withdraw from the agreement upon the worker's death before approval.
 
 
 54
 National Union's contention that those proceedings should start over again before an ALJ because there was a need for an evidentiary hearing is baseless. It is indeed adoption of National Union's position that might create duplicative litigation.
 
 
 55
 VI. USE OF AN EXTRA-STATUTORY OFFSET TO AVOID A DOUBLE RECOVERY?
 
 
 56
 Because the settlement agreement compromised the dispute over whether Nordahl's disability was permanent or merely temporary, National Union is claiming what the government characterizes as an "extra-statutory offset." What really lies behind this issue is the alleged injustice to the insurer of potential death-benefit liability, while paying $75,000 it would not have had to pay if it could have withdrawn from its agreement because of the worker's death.
 
 
 57
 National Union relies mainly upon the recent agency ruling in Martin v. Kaiser Co., 20 B.R.B.S. 679 (1987) (ALJ), where collateral compensation sources, as well as accrued permanent partial disability payments, were used to offset death benefits sought by a widow in her own right and as representative of her deceased husband. The claims examiner recognized that
 
 
 58
 [T]here are persuasive reasons to believe that Congress and the courts have a policy that weighs against double recovery, and payments that could be called "windfall," even if the Act only spells it out in sections like 933(f), which, if interpreted literally, are inapplicable, and even if technically no double recovery.
 
 
 59
 Id. at 690.
 
 
 60
 It is clear that the ALJ in Martin knew he was reaching beyond the statutorily authorized offsets, but the result might be justified by the distinction with the present case that the disability claim had not been settled before death. It is clear that if Nordahl's application had been approved before his death, there could have been no "extra-statutory offset." The question, then, is whether a submitted but unapproved settlement is closer to an approved application or an entirely unsettled claim. We think that the legislative purpose, history, and structure discussed above compel decision for analogy to approved agreements.
 
 
 61
 The persuasiveness of Martin, which has not yet been reviewed by the whole Board, is suspect despite this distinction. The spectre of double recovery for the widow here presupposes two uncertain premises lacking in the Martin case.
 
 
 62
 First, the carrier's argument ignores the fact that settlement of his disputed disability claims has no effect whatsoever upon her widow's benefits, because she does not seek the disability settlement. While it is reasonable to assume that Mrs. Nordahl will take at least some portion of her childless husband's estate, it is equally plausible that the entire $75,000 will go to a home for destitute longshoremen; the point is that her right to death benefits is unaffected by potential payment from proceeds of her husband's claim. No inquiry into the disposition of the estate is necessary or even appropriate in evaluating the existence of her right, though administrative determination of the level of death benefits payable, if any, will consider her other sources of support, including the size of the estate.
 
 
 63
 In Martin, the widow sought both benefits in the same proceeding, and so administrative offset may have been appropriate under overriding policy considerations, despite the lack of statutory authority. Second, National Union's position supposes that enforcement of the disability settlement constitutes a windfall for her, further supposing that she can establish that her husband's death was caused by his debilitating injury on the job and that there consequently is an enforceable death-benefits claim at all.
 
 
 64
 a. Procedures to determine death benefits.
 
 
 65
 The agency rules treat a spouse's benefits differently if the death after settlement of the disability claims was, or was not, related to the debilitating injury. If death stemmed from the same medical conditions compensated for by the diability settlement, the extent, if any, that the lump sum was intended to provide for survivors can be evaluated. If the employee should die from causes other than the compensable injury, however, and death benefits are payable under the schedules, then there is no consideration of the value to the estate of settlement payments received or periodically owing. LHWCA, Sec. 9; 20 C.F.R. Sec. 702.241; 20 B.R.B.S. 18, 22 note 3; 1A E. Jhirad, Benedict on Admiralty Sec. 76c (7th ed. 1987) ("Compensation Payable--Death Following Permanent Total Disability").
 
 
 66
 While the government is absolutely correct that disapproval of the compromise would open up a very nasty suit about the extent of his injuries,[14] it is clear that such a determination, had it been necessary, would have been quite different from the proof necessary to show that death was injury-related. Consequently, National Union is incorrect that the same evidence would have been reviewed by an ALJ for the disputed disability and for the new death benefits, had the Deputy Commissioner not taken the decision away from its proper forum.
 
 
 67
 Even if the settlement was intended to incorporate compensation for death, as National Union contends, the claims examiner can readily interpret the agreement as the Petitioner companies urge. If it is determined that the death is compensable, the government correctly notes that the insurer can bring up the question of what effect post-death payment of the disability settlement should have on the amount of death benefits payable. The procedures in the current death-benefits proceedings assure that there will be no double recovery on the two distinct statutory benefits.
 
 
 68
 b. Disability payments versus death benefits.
 
 
 69
 Of course, this appeal for a Martin offset ignores and attempts to obscure the fact that what the insurer agreed to accept for its lump-sum payment was not the waiver of potential death benefits intended to support dependents, but only the release of future and currently disputed disability benefits owing or owed to the worker himself. The agency's interpretation of the governing law, as long represented in the administrative regulations implementing the LHWCA, is that the amount of disability compensation received is not to be considered in reducing subsequent death benefits. 20 C.F.R. Sec. 702.241. And since 1987, no compromise of death benefits can be included in a settlement of disability claims unless they too have vested in the spouse as a result of death of the uncompensated disability claimant. 20 C.F.R. Sec. 702.241(g). The government lays out these policy objectives clearly:
 
 
 70
 The fact that the settlement amount here has turned out to be more than would otherwise have been payable for disability, and that Nordahl's widow will [reap a windfall], gives National Union no right to reduce the [scheduled] death benefits payable to the widow--anymore than a widow would be entitled to augment her recovery for death on the ground that the settlement of her husband's disability claim, years before, turned out to be less than a " 'single complete recovery,' " ... for his lifetime disability, leaving a smaller estate for her to inherit from him. ... [This] bargained-for over-recovery for disability, and [that] there may be a single recovery for death [gives] National Union ... no valid complaint about this result, any more than would a widow of a disabled worker under compensated by a settlement [have a claim].
 
 
 71
 It must be noted, also, that 20 C.F.R. Sec. 702.241(g) (1987) explicitly prohibits settlement or compromise of the right to death benefits before it arises, i.e., before the death of the injured worker. While we ascribe no retroactive effect to the new provision on these 1985 negotiations, considerable suspicion is nonetheless placed upon the carrier's contention that the contingency of death benefits was never considered in the negotiations.
 
 
 72
 It is more realistic to assume that the parties did not include them in the waiver of future liability because the insurance representative knew that the attitude of the Director of the Office of Workers' Compensation Programs was that such agreements were, or at least should have been, void as against public policy. This fact militates further against consolidation of the two independent claims, even if Nordahl at the time might legally have expressly waived his family's separate future claim. We find that Clause 8 of the settlement did not purport to waive spousal death benefits, despite the wording that "this settlement shall discharge ... any and all claims ... which may, or at any time hereafter, be asserted by Employee, his heirs, executors, administrators, or assigns as a result of, arising out of, or in any way connected to the accident."
 
 VII. CONCLUSION
 
 73
 In short, the carrier should be held to its agreement. Accordingly, we AFFIRM the judgment below.
 
 
 
 [1]
 Thus it is not clear that Nordahl was fully compensated during his lifetime, as National Union continually asserts. At least part of the lump sum represented amounts he felt he was, and might in fact have been, owed if the claims examiner determined that he was originally permanently disabled or that he was still totally disabled after he reached "maximum medical improvement". If it were to be found that he had a permanent disability from the outset, he would be entitled to some $52 to $64 per week back-compensation for the 208 weeks he was disabled before his death, or an amount near $12,500. Even if the increased rate was applicable only after he reached "maximum medical improvement," stipulated to be roughly one and one-half years before death, Nordahl would have had a claim for some $4,500 back-compensation owing for some 75 weeks. Thus the settlement represented at least $4,000-12,000 compromised for moneys owing and not payable in the future, not the mere $671 suggested by counsel for the carrier at oral argument. See infra n. 14
 
 
 [2]
 Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927, c. 509, 44 Stat. 1428, as amended, 33 U.S.C. Sec. 908(i)(1) ((1982) & Supp. II (1984)); LHWCA Amendments of 1984, Pub.L. No. 98-426, Sec. 27(d)(1), 98 Stat. 1639, 1654 (Sept. 28, 1984) (which rendered gender-neutral the LHWCA's long title, by deleting the "men's") (emphasis added)
 
 
 [3]
 The Act's only original exception to liability was Sec. 14(j), 44 Stat. 1433, which allowed "commutation" of future payments to a lump sum payable immediately, if found by the administrator to be "for the best interests of a person entitled to compensation." Recognizing the risk to insurance carriers that could be posed by such commutations during the Great Depression, Congress in 1934 amended the standard for administrative approval of lump-sum commutations to "the interest of justice," instead of calling only for consideration of the claimant's "best interests." Act of May 26, 1934, c. 354, Sec. 4, 48 Stat. 807
 Four years later, Congress added another "exception" to the statutory invalidity of any agreement by a claimant to release his rights to compensation, by adding a new subsection. Limited to partial-disability cases, Sec. 8(i) approval could now be given to "agreed settlements ... discharging the liability of the employer for ... compensation [otherwise payable], notwithstanding the provisions of section 15(b) and section 16," whenever the administrators found such a proposed settlement to be "for the best interests of [the] injured employee." Act of June 25, 1938, c. 685, Sec. 5, 52 Stat. 1165, adding LHWCA Sec. 8(i). Congress indicated that the new provision was not intended to permit settlement approval "merely as a convenience in disposing of cases," but for the limited purpose of fixing the otherwise variable amount payable for partial disability. S.Rep. No. 1988, 75th Cong., 3d Sess. 6 (1938); H.R.Rep. No. 1945, 75th Cong., 3d Sess. 6 (1938). Unless the separate commutation provision of Sec. 14(j) was also invoked and lump-sum payment administratively approved, these Sec. 8(i) settlements were still required to be payable periodically, as the LHWCA generally provided. Finally, the new provision required continuation of periodic payments under an approved settlement for the duration agreed upon, to the disabled worker's survivors, if the worker died after approval but before full payment.
 Section 8(i) was amended in 1972 for the first time since 1938. Congress deleted the restrictions on approval authority to partial-disability cases and to those settlements payable periodically unless commuted under the terms of Sec. 14(j). LHWCA Amendments of 1972, Pub.L. No. 92-576, Sec. 20(a), 86 Stat. 1251, 1264 (Oct. 27, 1972), amending LHWCA Sec. 8(i), as amended, 33 U.S.C. Sec. 908(i) (1982). Thus, it authorized, for the first time, lump-sum compromise settlements, and extended to all disability cases, though not to death cases.
 In 1984, Sec. 8(i) was again broadly amended; the subsection thus contained its present terms before execution or submission of the settlement agreement in this case. LHWCA Amendments of 1984, Pub.L. No. 98-426, Sec. 8(f), 98 Stat. 1639, 1646 (Sept. 28, 1984), amending LHWCA Sec. 8(i), as amended, 33 U.S.C. Sec. 908(i) (Supp. II 1984). Cf. Maher v. Bunge Corp., 18 B.R.B.S. 203 (1986).
 The new provision changed the standard for approval, from requiring administrative determination that the proposal is "for the best interests of [the] injured employee" before approval, to requiring approval "unless [the agreement] is found to be inadequate or procured by duress." When the parties are represented by counsel, the subsection further provides for automatic implied approval at the end of thirty days from submission of the agreement, "unless specifically disapproved" within that time. The amended text no longer refers to the death of the worker before a settlement amount has been paid, nor is settlement-approval authority limited, as previously, to disability cases. As the implementing regulations make clear, however, the right to death benefits may not be settled before it arises, i.e., before the death of the injured worker. 20 C.F.R. Sec. 702.241(g) (1987).
 In making approval mandatory, there was a clear intention to "provid[e] a means to expedite settlements" by requiring more prompt administrative action on requests for approval, and to permit such approval by ALJs as well as by the deputy commissioners. H.R.Rep. No. 98-1027, 98th Cong., 2d Sess. 32 (1984) (Conference Committee), 1984 U.S.Code Cong. & Admin.News 2771, 2782.
 The principal effect of the 1984 amendment, however, was to allow the parties to any LHWCA case far greater contractual autonomy than previously to compromise and release rights to compensation and medical benefits. Sections 15(b) and 16 still invalidate any release by a compensation claimant without Sec. 8(i) approval, and Sec. 8(i) itself now provides that "[n]o liability [under the Act] shall be discharged unless the application for settlement is approved."
 But that approval is no longer dependent upon affirmative administrative determination that the compromise is in the injured worker's best interests. Rather, approval is now required (and, for claimants with legal representation, automatic) in the absence of an affirmative determination of inadequacy or duress. Adequacy is to be determined largely by comparison of the settlement with statistical norms and depreciation tables. 20 C.F.R. Secs. 702.241-.243. Since disapproval of a settlement agreement on any other ground is impermissible, the paternalistic limits are lessened, though the guarantee of protection of claimants has not been eliminated entirely.
 
 
 [4]
 The companies assert one other ground upon which they hope to distinguish Maher. The Outer Continental Shelf Lands Act (OCSLA) is applicable here and not in Maher. It provides for application of state law where necessary "to the extent that [it is] applicable and not inconsistent with" federal law. In Nations v. Morris, 483 F.2d 577, 585 (5th Cir.), cert. denied, 414 U.S. 1071, 94 S.Ct. 584, 38 L.Ed.2d 477 (1973), it was held that such applications were limited to instances in which a "significant void or gap" in federal law requires reference to state authorities. While property and other common-law fields were envisioned, there may be statutory omissions that need to be similarly filled; however, no more comprehensive a workers' compensation scheme could be mapped out than the LHWCA. It explicitly provides for settlements, and no gap-filling is required
 This OSCLA claim is made solely in order to cite state court decisions allowing pre-approval withdrawal from compensation settlements resulting from changed circumstances after an employee's death. Half of each side's brief on appeal is devoted to arguing conflicting state cases. While it is not fair to characterize the government's citations as generally any more persuasive in their exposition of public policy concerns, the statutes in question that were most similar to the LHWCA were held to preclude withdrawal on account of death of the claimant.
 The government's main point about those cases holding the death of a claimant to terminate administrative authority to approve presubmitted settlements is that they rest upon statutes drafted in such a way as to negate the agreement in its entirety, not just the claimant's release of future disability benefits. National Union's state cases are indeed based upon statutory provisions materially different from those of the LHWCA--typically invalidating not just claimants' releases, but settlement agreements themselves, until administrative approval, or providing for approval only if the settlement is in the best interest of both parties, not just that of the worker.
 While the state law cases are discussed briefly below, it is a compelling contention, ignored by both parties, that not only is state law not controlling, but no support therefrom should be garnered either way. Regardless of applicability of the OCSLA, the decisions holding the LHWCA a self-contained scheme are legion, and the only state authority generally allowed is that from New York. The New York case on point, Zielinski v. General Motors Corp., 1 N.Y.2d 424, 153 N.Y.S.2d 642, 135 N.E.2d 808 (1956), is inapposite. See infra n. 5.
 
 
 [5]
 The principal case upon which National Union relies is Zielinski v. General Motors Corp., 1 N.Y.2d 424, 153 N.Y.S.2d 642, 135 N.E.2d 808 (1956). It is true that Lawson v. Suwannee Fruit & S.S. Co., 336 U.S. 198, 205, 69 S.Ct. 503, 506, 93 L.Ed. 611 (1949), established that the LHWCA could be clarified by analogy to the legislative history and judicial interpretations of New York's early workers' compensation act, which was relied upon by the drafters of the first longshoremen's statute
 Such use of New York case law is in the way of legislative history more so than as persuasive interpretations of similar provisions by a competent and esteemed judiciary. In either case, however, no reference to the settlement-approval provisions under the New York legislation is at all appropriate, since the approval requirement was not adopted in New York until after the original formulation of Sec. 8(i) was promulgated in 1938.
 Thus whatever weak support Zielinski might otherwise have provided for National Union's position, the carrier enjoys no apposite analogy in the New York Court of Appeals' holding that approval after a claimant's death was an administrative action "entirely without jurisdiction and a nullity." Zielinski, 153 N.Y.S.2d at 644, 135 N.E.2d at 809. Additionally, under the statute there in question, not just a claimant's release, but the whole lump-sum settlement was prohibited from becoming "effective for any purpose or create any rights unless and until approved." N.Y.Cons.L., c. 67, Sec. 15, subd. 5b. Thus not only performance but also enforceability was dependent upon approval.
 Containing a stinging dissent by Judge Froessel of twice the length of the per curiam opinion, Zielinski is thus reconcilable with the different result dictated by the LHWCA because of the difference in statutory treatment of settlement agreements. It is interesting to note that this "instructive" authority advanced by National Union has never before been cited outside of New York opinions, and even there not since 1961. Thus while National Union urges the "majority trend" of state court cases, it is constrained by even its best case, Zielinski, to thirty-year-old decisions of a mere 30 lines without any real consideration of the law or policy choices involved.
 Resort to policy considerations is not necessary with the LHWCA, so the various decisions National Union cites from other state courts are equally unavailing. Since Sec. 8(i) prohibits claimant releases from becoming effective until approved, and Secs. 15(b) and 16 say that the worker's obligations under a settlement agreement are invalid without approval, debate over the propriety of extending a grace period for reconsideration to insurers "in the interests of justice" or "of the parties" is unnecessary. Whatever policy argumentation may be made that is supported by such alternate statutory language, it is unpersuasive in the interpretation of the LHWCA.
 Conversely, Maher mentioned a Massachusetts case, the textual and policy reasoning of which would be persuasive if there were any doubt about the asymmetry created by Sec. 8(i). Parallel to the former wording of the LHWCA, the workers' compensation statute in Ferreira v. Arrow Mutual Liability Ins. Co., 15 Mass.App. 633, 447 N.E.2d 1258 (1983), "stated the broad legislative policy of considering the 'best interests of the employee or his dependents' "; consequently, "there was no obstacle to administrative approval after employee's death." Maher, at 204. Because Ferreira is adverse to its position and reasonably persuasive on account of the identity of statutory language, National Union is quite critical of this particular reference to a state law case.
 However, the Review Board explained that it had cited Ferreira in Maher "not because the Massachusetts appeals court's reasoning was viewed as controlling, but because it was based on sound policy considerations." 20 B.R.B.S. 19, 21. The opinion then quoted a passage much relied upon by the Respondent: "[T]o allow rescission [of an agreed-upon settlement] at this stage of the proceedings simply because the agreement had not been approved before the death of the employee would even apart from equitable considerations, be disruptive of the time and energy of the [adjudicating tribunal] and hence contrary to the principles of sound administrative procedure." Id. (quoting Ferreira, 447 N.E.2d at 1260).
 Though it is unnecessary and somewhat inappropriate to argue the state law lines of decision, it should briefly be mentioned that National Union's only effort to limit the devastating impact of Ferreira upon its interpretation of the LHWCA, is to argue that the insurer there was aware that the claimant was terminally ill when agreeing to the settlement. Because "all parties were unquestionably apprised of the ... probability of impending death at the time of the settlement application," National Union contends the agency could approve the compromise and release, whereas here the "employer/carrier possessed no such knowledge at the time of settlement negotiations."
 If anything, this distinction weighs the other way and further weakens National Union's position, because such imputed knowledge would have militated against offering a lump-sum payment, and so ignorance made the deal cut by National Union seemingly even more attractive. As the government eloquently argues, the benefit to the payors in settling is protection against the possibility of paying disability compensation for decades if the disabled worker turns out to be long-lived. Absent a bilateral right of withdrawal, National Union should be kept to its bargain because it struck a deal that would have, had he survived, compensated Nordahl for only three and one-half years, if paid periodically.
 
 
 [6]
 The parties agreed, at oral argument, that there is no statutory or other reason why, in the future, carriers cannot bargain for a provision, in the settlement document, allowing them to withdraw if the claimant dies before administrative approval. Indeed, National Union concedes that it could have bargained for such a clause in the instant matter
 
 
 [7]
 See generally Ingalls Shipbuilding Div. v. White, 681 F.2d 275, 291 (5th Cir.1982). See also 20 C.F.R. Secs. 702.241-.243, particularly at Sec. 702.243(f)-(g) (1987) (determining adequacy of the agreed amount largely on the basis of actuarial tables)
 
 
 [8]
 Experience demonstrates, as common sense would suggest, that insurers benefit overall, because they escape liabilities payable, absent settlements, more often than they pay beyond the liability they would otherwise have borne. See generally L. Russell, "Compromise & Release Settlements," in 3 Supplemental Studies for the National Comm'n on State Workmen's Compensation Laws 179-215 (1973); 3 A. Larson, Law of Workmen's Compensation Secs. 82.20, 82.30-.32, 82.40-.43, 82.70-.72 (1987)
 
 
 [9]
 Of course, such policy determinations should be made by Congress, not by this court. Since employers and insurers enjoy no statutory rescission provision, if they wish to protect themselves, carriers must create a contractual right of withdrawal
 
 
 [10]
 Providence Washington Ins. Co. v. Director, OWCP, 765 F.2d 1381, 1393 (9th Cir.1985); Sans v. Todd Shipyards Corp., 19 B.R.B.S. 24, 25 (1986)
 
 
 [11]
 What National Union views as a bifurcation of determinations of its liability obscures the actual distinction between settled disability claims and newly-arisen death benefits sought by the widow. The insurer argues unpersuasively that:
 [T]he Board's actions belie its rhetorical references to the pursuit of judicial economy and efficiency. In fact, the Board's decision and order frustrates these desirable policy objectives by unnecessarily dividing what should be a single, comprehensive proceeding.... The pending death claim is the proper vehicle for determining if the employer/carrier is obligated to continue future financial support of Mrs. Nordahl [, because if referred to an ALJ, he or she] could have, in one proceeding, determined if the death was related to the injury and thus discerned the obligation, if any, ... to continue its financial support of the claimant's beneficiaries.
 
 
 [12]
 Submission for expedited approval removed this matter from the operation of 20 C.F.R. Secs. 702.301 et seq., and put it under 20 C.F.R. Sec. 702.243(b). The regulations on "general" "Adjudication Procedures" for disputed LHWCA claims, on which National Union relies, were entirely inapplicable to what was pending before the Deputy Commissioner, because the regulations applicable were not those for general adjudications, but those for "Agreed Settlements," 20 C.F.R. Secs. 702.241-.243. The relevant provision, 20 C.F.R. Sec. 702.243(b), directs that after submission of the application for approval, "the adjudicator," defined for these purposes as the Deputy Commissioner or an ALJ to whom the application is submitted, 20 C.F.R. Sec. 702.241(a), "shall consider the settlement application within thirty days and either approve or disapprove the application."
 
 
 [13]
 LHWCA Sec. 21(b)(3); Lauzon v. Strachan Shipping Co., 602 F.Supp. 661, 664 (S.D.Tex.), aff'd, 782 F.2d 1217, 1222 (5th Cir.1985) (where disputed issues were purely legal and no relevant facts needed development by presentation of evidence, resolution by the Deputy Commissioner was not inappropriate despite Sec. 19(d))
 
 
 [14]
 The calculation of just what Nordahl would have been owed, based upon determination of permanent as against temporary total disability, was hotly contested on appeal. National Union somehow concluded that he would have been at best entitled to some $671 above the almost $50,000 he had received. A sum between $4,500 and $12,000, depending upon when permanent total disability could be established, seems more accurate. See supra n. 1