UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1094

ROBERT B. REICH,
SECRETARY OF LABOR,

Plaintiff, Appellant,

v.

BATH IRON WORKS CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Selya, Cyr and Boudin,

Circuit Judges.

Joshua T. Gillelan II, Senior Attorney, Office of the Solicitor,
Department of Labor, with whom Thomas S. Williamson, Jr., Solicitor of
Labor, and Carol A. De Deo, Associate Solicitor, were on brief for
appellant.
Robert H. Koehler with whom Judith Bartnoff and Patton, Boggs &
Blow were on brief for appellee.

December 16, 1994


BOUDIN, Circuit Judge. Bath Iron Works, Inc. ("Bath")

is a Maine corporation that has long engaged in shipbuilding

and the repair of ships. It has employees who are covered by

the Longshore and Harbor Workers Compensation Act, 33 U.S.C.

901-50 (the "Longshore Act"). That statute enacts an

extensive workers' compensation program that protects

longshore and other specific classes of workers whose

injuries occur upon navigable waters of the United States or

adjoining facilities like piers and dry docks. Id. 903(a).

For the most part, scheduled payments for death or

disability are made either by the employer or under insurance

coverage; Bath, as it happens, is a self-insurer. But

Congress has also included in the Longshore Act a so-called

"special fund," 33 U.S.C. 944, administered by the

Secretary of Labor ("the Secretary"). The fund is used for

various purposes--most importantly, for "second injury" or

"section 8(f)" payments made under 33 U.S.C. 908(f), a

provision described below. See 33 U.S.C. 944(i). The

special fund is primarily funded by annual assessments levied

by the Secretary on employers subject to the Longshore Act.

Id. 944(c).1 



1The statute refers to contributions by self-insured
employers or carriers; but for simplicity we refer to
"employers" throughout the opinion.

-2- -2-

In this case the Secretary brought suit against Bath in

the district court to recover supplemental assessments for

the special fund claimed to be due by the Secretary. Because

the dispute involves Bath's obligation to the special fund,

the statutory formula used to determine such obligations--33

U.S.C. 944(c)(2)--needs to be explained. First, the

statute requires the Secretary to estimate the fund's

expected obligations for the forthcoming year, including

expected section 8(f) payments. Id. Then, the Secretary

estimates other fund income (e.g., fines) and levies the

balance by assessing employers. Id. Specifically, the

Secretary fixes and assesses each employer's share under a

formula that takes the average of two fractions, both of

which use the prior year's experience as a base. Id.

One fraction is the ratio of the individual employer's

workers' compensation payments "under this chapter" [the

Longshore Act] during the prior year to all such payments by

all employers under the chapter during that year. 33 U.S.C.

944(c)(2)(A). The other fraction is the ratio of the

section 8(f) payments attributable to the employer during the

prior year to all such section 8(f) payments attributable to

all employers for that year. Id. 944(c)(2)(B). In brief,

the employer's obligation is based in part on its own prior

payment experience and in part on the special fund's

-3- -3-

experience in making section 8(f) payments to that employer's

employees.

For example, if Bath's compensation payments under the

Longshore Act for 1988 represented three percent of all such

employer payments for that year, and the special section 8(f)

payments for Bath employees represented one percent of all

such section 8(f) payments for that year, Bath's assessment

would be two percent of the (otherwise unfunded) special fund

obligations for 1989, as estimated by the Secretary. Under

such a formula, every employer has an interest in seeing its

own workers' compensation payments "under this chapter"

represented by as small a figure as possible. The lower the

figure, the more the burden of financing the special fund is

shifted to other employers.

The present case arose because Bath calculated its own

assessment by excluding from the formula calculation under

section 944(c)(2)(A) most payments it made to injured

employees who were covered both by the Longshore Act and the

Maine Workers Compensation Act. Me. Rev. Stat. Ann. tit. 39,

1 et seq. The Maine statute generally provides comparable

payments, and both regimes encourage the employer to make

payment without having the employee file a formal claim.

Where both statutes covered the same injury in the same

amount, Bath said that it was making payment under the Maine

-4- -4-

statute and filed a boilerplate denial of liability under the

Longshore Act. See 33 U.S.C. 914(d).

An employer's payment of workers' compensation under a

state statute discharges the employer's liability pro tanto

under the Longshore Act. This was well settled by court

decision long ago and eventually Congress enacted a provision

to this effect. 33 U.S.C. 903(e). Thus, in such dual

liability cases, Bath's payments--purportedly under the Maine

statute--erased its liability under the federal statute as

well. This erasure of federal obligations led the Secretary

to recalculate Bath's formula assessment on the premise that

such dual liability payments should be treated as ones made

"under" the Longshore Act. Bath disagreed. The Secretary

brought suit.

In the district court, the magistrate judge entered a

recommended decision in favor of Bath, and the district court

approved the recommendation and dismissed the Secretary's

complaint. The gist of the district court's decision was

that the language of the formula--specifically, its reference

to an employer's payments made "under this chapter"--was

clear and unambiguous. "The subsection [944(c)(2)(A)]," said

the district court, "speaks in terms of payments, not

liability"; and it deemed the dual liability payments in

dispute to be ones made under Maine law, not the Longshore

-5- -5-

Act. The court also relied secondarily on legislative

history and policy.

On this appeal, the Secretary takes the position that

his own reading of the formula language is at least

permissible, is a reasonable one, and is entitled to the

deference ordinarily due to the agency or department under

the Chevron doctrine. Chevron v. NRDC, 467 U.S. 837 (1984).

We generally agree with the Secretary that the statutory

language permits his reading, which is entitled to a measure

of deference. We also think that the history of the

provision supports the Secretary's reading. Finally, there

is no clue anywhere that the distinction proposed by Bath was

ever considered, let alone adopted, by Congress.

Starting with statutory language, the parties devote

many pages to the question whether the disputed payments are,

in a literal sense or by various characteristics, payments

"under" the Longshore Act. We do not think that the bare

words "under this chapter" are precise enough to resolve our

case. As a matter of dictionary meaning, the phrase could

(as Bath claims) refer to the statute invoked by the payor

when making the payment--here, the Maine statute--or it could

(as the Secretary claims) cover any payment that erases or

discharges a liability that otherwise exists under the

federal statute, regardless of what the payor says when

handing over the money.

-6- -6-

The surrounding circumstances seem to us equally

uninformative. It makes no difference to any known purpose

of Congress, or any suggested policy underlying the statute,

that Bath did, as it claims, file repeated boilerplate

notices of contravention denying liability under the federal

statute. Conversely, it does not matter whether, as the

Secretary claims, Bath reported the accidents in question to

federal authorities, as other provisions required it to do.

These arguments are examples of fussing about inessentials.

What matters, given that the statute's language is open

to more than one reading, is the history and purpose of the

provision. Congress adopted an earlier version of this

formula in 1972 when the assessment device was first adopted

to support the special fund. Under the 1972 amendments, the

assessment was based on the proportion of the employer's

prior year "payments made on risks covered by this Act" to

"the total of such payments made by all" employers. 86 Stat.

1251, 1256. This is a variation, of course, on the language

now comprising the first half of the statutory formula.

Compare 33 U.S.C. 944(c)(2)(A).

In recent years, the main use of the special fund has

been to encourage employers to hire workers who have suffered

a previous partial permanent disability. For various

reasons, employers feared that such a worker who suffered a

new disability might impose extra liability on the employer

-7- -7-

where the first injury contributed to the severity of the

second; a good example is the loss of an eye by a worker

already blind in one eye. See Lawson v. Suwannee Fruit &

Steamship Co., 336 U.S. 198 (1949); 2 A. Larson, Workmen's

Compensation Law 59.31(a) (1994). The section 8(f) regime

was designed to lessen this discouragement.

For some years, section 8(f) has accomplished this end

by making the special fund, and not the employer, liable in

certain circumstances for so-called "second-injury"

compensation payments, beginning after 104 weeks of employer

payments. 33 U.S.C. 908(f). In 1972, when Congress first

adopted the employer assessment device to support the special

fund, it also greatly enlarged the scope of the fund's

liability by inter alia extending the fund's liability

retroactively to provide some coverage for some second

injuries that had occurred prior to the new statutory

amendments.

What Congress discovered between 1972 and 1984 is that

employers were "dumping" as many cases as possible in the

section 8(f) basket. This meant that the employer not only

avoided compensation liability to the worker after 104 weeks

(as intended) but also (unexpectedly) lowered the employer's

future formula payments to the special fund below the level

that would otherwise have applied. The lowering occurred

because the original 1972 formula only counted payments by

-8- -8-

the employer as increasing the employer's fraction; section

8(f) payments made by the fund, on account of the employer's

double-injury employees, did not increase the employer's

assessment.

Under the new section 944(c)(2) formula adopted in 1984

and in force today, the payments by the fund on account of

these double-injury employees is now attributed to the

employer to the extent that such payments increase the

employer's assessment under the second half of the formula.

This second half represents only 50 percent of the final

assessment; thus the employer gets some help when the fund

takes over compensation and, presumably, the employer retains

some incentive to hire the partly disabled. But the employer

does see its future assessments rise somewhat as the employer

transfers responsibility to the special fund.

As Congress saw it, "[t]his [new] formula will, at once,

dissuade the dumping of cases into the fund, and will more

equitably apportion the responsibility of paying for the

fund."

130 Cong. Rec. 25,904 (1984) (statement of Mr. Miller).2

Further, because the employer now has a continuing (albeit

indirect) interest in holding down unjustified payments to



2The statutory solution ultimately devised by Congress
was adopted late in the day by the Conference Committee and
explained only in floor statements. Compare H. Rep. No. 98-
570, 98th Cong., 1st Sess. 20-21 (1983), with Conf. Rep. No.
98-1027, 98th Cong., 2d Sess. 31 (1984).

-9- -9-

employees even after 104 weeks, the legislators expected that

unjustified disability claims would be better policed than

they had been by the fund administrators. Id. Other

explanations for the change are consistent. 130 Cong. Rec.

26,297 (1984) (statement of Senator Nickles).

In sum, prior to 1984 Congress intended the special fund

to be paid for by employers primarily in proportion to their

experience in paying compensation claims required to be paid

by the federal statute ("payments made on risks covered by

[the] Act"). No reason is suggested to us why Congress might

have wished in 1984 to lower an employer's share because, by

happenstance, the employer was located in a state with

generous compensation laws of its own and the employer chose

to pin a state label on its payment while discharging an

obligation that existed under both federal and state law. By

the same token, no legislative evidence indicates that

Congress intended to make such a change in 1984.

Bath infers such an intent because Congress in 1984

altered the 1972 phrase "payments made on risks covered by

[the] Act" to refer instead to payments "under this chapter."

As best we can tell, Congress happened by chance to alter the

wording of the original 1972 sentence when--in a last-minute

compromise (see note 2, supra)--it adopted the 1972 provision

as the first part of the new two-part formula. To the extent

that the 1972 language is slightly more helpful to the

-10- -10-

Secretary, it strengthens the Secretary's present position

slightly, rather than detracts from it, precisely because

there is no indication that Congress meant to change the

substance of that part of the formula.

There is only one discrepancy that gives us any pause.

In 1991, the Secretary's Benefits Review Board rendered a

decision in a case entitled Stewart v. Bath Iron Works Corp.,

25 B.R.B.S. 151 (1991). There, it appears that a second-

injury employee of Bath withdrew a claim for compensation

under the Longshore Act when Maine's benefits proved more

generous. Although the Stewart opinion is difficult to

decipher without more information, the Board apparently took

the view that section 8(f) relief from the special fund was

not available to Bath because the payments that Bath was

making to the employee were required of Bath by the Maine

statute but not by federal law.

Bath argued to the district court, and repeats here, its

claim that "it would be anomalous to base [Bath's] special

fund assessments on state law payments, when special fund

relief is not available to [Bath] from its obligations under

the Maine [compensation law]." The technical responses

offered in the government's reply brief may explain why the

district court saw some merit in Bath's reliance on Stewart.

The government's failure either to answer Bath's central

-11- -11-

argument, or to concede the discrepancy, is not what we would

expect from government counsel.

Bath's argument is relevant in the sense that a

construction that produces anomalous results is, by that fact

alone, a more doubtful reading of a statute. Public

Employees Retirement Sys. of Ohio v. Betts, 492 U.S. 158,

177-78 (1989). Still, nothing in Stewart is literally

inconsistent with the government's reading of the assessment

formula; Stewart turns on a reading of other provisions of

the Longshore Act that are not centrally involved in this

case. At worst, Stewart--assuming it was correctly decided--

produces an apparent possible inequity of a kind that is not

unknown in complex statutory arrangements. Puerto Rico

Telephone Co. v. FCC, 553 F.2d 694, 700 (1st Cir. 1977).

We have far too little information to assess fully the

dense and elliptical opinion in Stewart. The case may have

been wrongly decided; or the anomaly may be a rarity that

carries no great weight in interpreting the formula

provisions before us; or it may not be an inequity at all

(the Board in Stewart refers to the possibility that Bath

could seek relief from Maine's counterpart to the special

fund provision). Bath gives us no information on any of

these matters, so there is no reason to feel distress on its

behalf in having to leave this dangling loose end.

-12- -12-

The judgment of the district court is vacated and the

case remanded for further proceedings consistent with this

opinion.

-13- -13-